**Paul W. PREISLER et al., Plaintiffs,**

v.

**The SECRETARY OF STATE OF MISSOURI and The Attorney General of Missouri, Defendants,**

**F. V. Heinkel et al., Intervenor-Defendants.**

No. 1064.

United States District Court
W. D. Missouri,
Central Division.

Dec. 29, 1967.

Probable Jurisdiction Noted
March 4, 1968.

See 88 S.Ct. 1053.

Paul W. Preisler, St. Louis, Mo., for plaintiffs.

Norman H. Anderson, Atty. Gen., of State of Mo., and Thomas H. Downey, Asst. Atty. Gen., for defendants.

Before MATTHES, Circuit Judge, and OLIVER and COLLINSON, District Judges.

JOHN W. OLIVER, District Judge, joined by WILLIAM R. COLLINSON, District Judge.

## I.

This case presents for judicial review the third effort made by a Missouri General Assembly since the 1960 decennial census to divide this State into ten congressional districts of as nearly equal population as is practicable, in conformity with the dual mandates of Article 3, Section 45 of the 1945 Missouri Constitution, V.A.M.S. and of Art. I, § 2 of the Constitution of the United States. Application of principles established by Art. I, § 2 of the Constitution, as construed by the Supreme Court of the United States, requires that we hold that this third effort does not pass constitutional muster.

The initial decision of this Court, rendered January 4, 1965, determined that the 1961 Missouri Congressional Redistricting Act was unconstitutional but deferred granting any judicial relief "until the Legislature of the State of Missouri has once more had an opportunity to deal with the problem;" this Court refused to presume that "the Legislature of the State of Missouri will refuse to take all necessary action to comply with its duty under the Federal, as well as its own State, Constitution." Preisler v. Secretary of State of Missouri, 238 F.Supp. 187, 191 (W.D.Mo.1965) (*Preisler I*).

Following *Preisler I* the Seventy-third General Assembly of Missouri enacted the 1965 Congressional Redistricting Act, Mo.Stat.Ann. Title 9, §§ 128.202–128.305 (1965). That Act was subjected to judicial scrutiny and held to be constitutionally void on the ground that it also failed to comply with the command of Art. I, § 2 of the Constitution. Preisler v. Secretary of State of Missouri, 257 F.Supp. 953 (W.D.Mo.1966) (*Preisler II*). Our decree in the second case, however, for reasons fully stated in light of Swann v. Adams II, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966), permitted the 1966 Congressional elections to be conducted under the constitutionally void 1965 Act. We retained jurisdiction for the purpose of reviewing any new Congressional redistricting plan enacted by a future General Assembly and signed by the Governor. 257 F.Supp. at 982. On January 9, 1967 the judgment of this Court was affirmed by the Supreme Court of the United States. Kirkpatrick v. Preisler, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511 (1967).

In 1967 the Seventy-fourth General Assembly of Missouri again tackled the problem. Its effort culminated in legislation which became effective on October 13, 1967, hereinafter referred to as the 1967 Act, Mo.Stat.Ann. Title 9, §§ 128.-202–128.305 (1967). This case pends on the Attorney General of Missouri's motion for approval of the 1967 Act and for dismissal of this case.

Plaintiffs contend that the 1967 Act is unconstitutional because the populations of the districts were not "as equal

as is practicable," since the variances between district populations are substantial. The 1967 Act is not challenged on any ground other than failure to comply with Art. I, § 2 of the federal Constitution. The parties who intervened in *Preisler II* and urged approval of the 1965 Act have appeared and participated in the same role in regard to the 1967 Act.

Defendants attached to their pending motion a map of the State of Missouri which illustrated the boundaries of the districts and purported to show the actual population of each district. Defendants' motion alleged that "all of the population figures referred to [on that exhibit] are based on the United States Census for 1960." Plaintiffs' responsive pleading suggested that the population data presented by defendants in their motion did not accurately reflect the 1960 census population data. Procedures were therefore adopted at a prehearing conference under which accurate figures were promptly obtained from the Bureau of Census.

The following table illustrates the differences between the population data presented by Appendix B attached to defendants' motion and that established by the accurate 1960 census figures:

Comparison of Population Figures
Represented As Accurate in
Defendants' Appendix B With
Actual 1960 Census Figures in Evidence

| District | Population Represented Def. App. B | Variance Represented Def. App. B | Actual Census Population | Actual Census Variation |
|---|---|---|---|---|
| 1 | 436,417 | + 4,436 | 439,746 | + 7,765 |
| 2 | 442,302 | +10,321 | 436,448 | + 4,467 |
| 3 | 431,507 | — 474 | 436,099 | + 4,118 |
| 4 | 423,815 | — 8,166 | 419,721 | —12,260 |
| 5 | 430,412 | — 1,569 | 431,178 | — 803 |
| 6 | 425,238 | — 6,743 | 422,238 | — 9,743 |
| 7 | 436,769 | + 4,788 | 436,769 | + 4,788 |
| 8 | 439,984 | + 8,003 | 445,523 | +13,542 |
| 9 | 428,223 | — 3,758 | 428,223 | — 3,758 |
| 10 | 423,866 | — 8,115 | 423,868 | — 8,113 |

It is apparent that defendants' Appendix B accurately reflected the actual population of only two of the ten districts (Districts 7 and 9). The variations in regard to two other districts (Districts 5 and 10) are obviously minor.[1]

Before the facts concerning the actual population variances were established, defendants' sole legal contention that the

---

1. It is apparent, however, that the substantial errors in Defendants' Appendix B made the allocation of the population of both of Missouri's metropolitan areas look better than the facts as established by the actual census figures. The mistakes made in regard to the population supposedly allocated to what are essentially rural districts are even more obvious. Defendants' Appendix B indicated that there were 3,000 more people in the rural Sixth District than the census shows are actually there; in the Eighth District, in which the 1960 census figures establish an actual population of 445,523, Defendants' Appendix B reflected a supposed population of only 439,984. When the question of justification of variances is reached, an obviously different question is presented in a case involving an alleged

1967 Act be approved was based on the notion that "the districts resulting from the 1967 Congressional Redistricting Act comply with the doctrine of *de minimis* in regard to population variances between the districts." After defendants learned that the actual population variances established by the 1967 Act were in many instances substantially greater than those set forth in defendants' pending motion, they advised the Court that defendants would like to adduce evidence to attempt to justify the greater variations that had in fact been established.[1a] Defendants and intervenors continue to contend that, in any event, the variances

actually established, even though greater than those that the 1967 Missouri Legislature believed it was creating, nevertheless should still be ruled to be *de minimis*.

Defendants' motion was set for hearing before the full panel of this Court as requested by defendants. The evidence adduced at that hearing established that the 1967 General Assembly of Missouri at no time ever considered accurate 1960 federal census population figures in its consideration of the 1967 Act. That evidence further established that the accurate 1960 census figures for all appropriate 1967 political subdivisions were in

---

variance of + 8,003 than is presented in a case involving an undisputed variance of + 13,542.

1a. Footnote 2 on page 6 of the dissenting opinion suggests that we were unfair to the Attorney General. We believe that the Attorney General's letters of October 11 and 17, 1967 referred to in that footnote cannot properly be read out of context but must be read in light of the prehearing proceedings revealed by the transcript of the September 26, 1967 conference. Swann v. Adams III was the subject of full discussion at that conference (September 26, 1967 transcript, pp. 32–34). It was there made clear that discussion of that and other cases was not to be considered by the Attorney General "as an invitation to either refrain from adducing evidence or to adduce evidence" (Ibid, p. 35). At that stage of this case, and at a time when the Attorney General's office did not have information concerning the accuracy of the figures presented in Appendix B, the defendants' sole legal contention was that "the variations are within the doctrine of *de minimis*" (Ibid, p. 34). At the close of the September 26, 1967 conference, the Assistant Attorney General stated:

MR. DOWNEY: Judge, I think it is clear from what you have said that although our motion is founded entirely on the theory that the present congressional districts fall within a *de minimis* doctrine, that *the issue of the justification variations by factors incident to a rational State policy are inherent in this case*, in the event that the Court should find that the districts do not fall within the doctrine of *de minimis;* and as I have told the Court, *I do not an-*

*ticipate at this time that production of evidence on the issue of rational State policy to explain the variations;* but when October 9 comes around, when we have had an opportunity to give this matter further consideration *we may reach a position to adduce evidence.* (Emphasis ours; Ibid, p. 36).

The Assistant Attorney General was advised at the September 26, 1967 conference that leave would be granted and full opportunity would be afforded to permit him "to put an alternative string in your bow that * * * there are legally justified reasons to explain the disparities as we finally determine what they may be" (Ibid, p. 37).

As stated in the text, *after* defendants learned that the actual population variances were greater than those set forth in defendants' pending motion, they advised the Court that defendants would like to adduce evidence. The letters of October 11 and 17, 1967 were written pursuant to the time table established at the pretrial conference (Ibid, pp. 21–29). Those letters did not need to and did not in fact reiterate that the Attorney General had elected to introduce evidence on the "issue of justification," also described at the September 26, 1967 conference as "the issue of rational State policy to explain the variations" about which the Attorney General had changed his mind between September 26, 1967 and October 9, 1967, when the stipulation of fact established what variations were actually involved. We believe that judgment as to whether the Attorney General was fairly or unfairly treated by the sentence in the text must be made by consideration of all and not isolated parts of the record.

fact furnished the experienced chairman of the Missouri Senate Reapportionment Committee (the same Senator served in the same capacity in regard to both the void 1961 and 1965 Acts) for his consideration and use. The inaccurate population figures presented by defendants' pending motion were in fact the inaccurate population figures used by both the Missouri Senate and House in connection with its legislative action that produced the 1967 Act.[2] Chief Judge Biggs' statement in Sincock v. Duffy, D. Dela.1963, 215 F.Supp. 169 at 194, is apposite. In considering a proposed apportionment plan for Delaware it was found as a fact that "census enumeration districts were included when they should have been excluded, or excluded when they should have been included." After noting that "to the extent they were erroneously included, the popula-

tion for the proposed district is overstated," Chief Judge Biggs said:

The erroneous exclusion or inclusion of enumeration districts in representative districts throws population figures askew. When one vote—one person is the aim, it is impossible to hit the bull's eye with a defectively sighted weapon.

The difficulties of attempting to reapportion the State of Missouri with inaccurate population figures is made vividly apparent by a comparison of the variances created by the unidentified population figures actually used by the chairman of the Senate Reapportionment Committee when he prepared the original of the bill eventually enacted, Senate Bill No. 182, (see pages 27–28 of the Chairman of the Senate Reapportionment Committee's deposition), with the variances in fact produced by that original

2. Stipulation Exhibits 16, 18, 20, 23, 25 and 27, and the deposition testimony of the Chairman of the Senate Reapportionment Committee establish that accurate 1960 census figures in fact were made available to the 1967 Missouri Legislature by election officials in the St. Louis and Kansas City metropolitan areas and by the Bureau of the Census. The House Majority leader, however, identified a map of Missouri used by him on which certain population figures had been written in longhand with red ink. That witness testified that the blue ink figures on that exhibit, reflecting an unexplained shift of 5,000 population from District 1 to District 3 in the St. Louis metropolitan area, were in his hand writing. The Chairman of the Senate Reapportionment Committee testified that he had used a similar map. He testified that the longhand red ink figures on his map had been copied from the longhand figures that appeared on the House Majority Leader's map. The composite of these longhand figures, the source of which is still unexplained, eventually appeared on Appendix B attached to defendants' pending motion.

Interestingly enough, the Senate Chairman volunteered that he had used his map in connection with each of the 1961, 1965, and 1967 Acts and that he had but recently noticed that Dade County's 1960 census population of 7,577 had always incorrectly appeared on his map as 12,647. That error of long standing did not affect

defendants' Appendix B because the population there reported for District 7, in which Dade County was located, was one of the two districts for which the 1960 census figures were accurately stated. The explanation for that phenomenon does not appear of record.

On page 1010 of his dissenting opinion Judge Matthes states, contrary to the finding of the majority opinion, that "inaccurate population data" were furnished the Legislature by "the various Election Boards in the City of St. Louis, St. Louis County, and Jackson County, which encompasses the Kansas City area." That finding is used as a base for the further finding that "the sponsors of the 1967 Act clearly labored under the misguided impression that the sources of the inaccurate figures were reliable."

As we have stated, we checked the accuracy of the data furnished by the election officials against the stipulated population data from the Bureau of the Census and found it to be accurate.

To state that the Legislature had but did not use accurate 1960 federal census figures is not to question the good faith of any member of the Missouri Legislature. That fact, it seems to us, forecloses that any public official other than the members of the Legislature can be charged with responsibility for the casual manner in which the important task of congressional apportionment was in fact approached by the 1967 General Assembly.

bill under the 1960 federal census figures. The following table makes that comparison:

Senate Bill No. 182
As Originally Introduced
by the Chairman of the
Senate Reapportionment Committee

| District | Figures Used by S.B. 182 Author | Apparent Variance | Actual Census Population | Actual Census Variance |
|---|---|---|---|---|
| 1 | 423,712 | − 8,269 | 408,950 | −23,031 |
| 2 | 444,462 | +12,481 | 460,469 [a] | +28,488 |
| 3 | 448,824 | +16,843 | 462,716 | +30,735 |
| 4 | 428,113 | − 3,868 | 428,224 | − 3,757 |
| 5 | 430,412 | − 1,569 | 434,459 | + 2,478 |
| 6 | 427,710 | − 4,271 | 427,710 | − 4,271 |
| 7 | 428,173 | − 3,808 | 423,103 | − 8,878 |
| 8 | 426,260 | − 5,721 | 429,928 | − 2,053 |
| 9 | 427,313 | − 4,668 | 412,249 [a] | −19,732 |
| 10 | 432,281 | + 300 | 431,966 | − 15 |
| | 4,317,260 | | 4,318,774 | |
| | | | + 39 [b] | |
| | | | 4,318,813 | |

[a] These figures represent the actual population of the respective districts as outlined in the Bill, adding the 1960 figures for the new Townships of Spanish Lake (formerly in Florissant) to the 9th District and of Ferguson to the 2nd District.

[b] The actual census figures for wards in St. Louis City as per Stipulated Exhibit No. 18 are 39 less than the total population. The Bureau of the Census has explained that this discrepancy "results from a number of technical factors in the processing of the data." (Stipulated Exhibit No. 18).

———◆———

The author of Senate Bill No. 182 twice testified that he was still under the impression the Missouri Legislature could comply with the "as nearly as is practicable" standard of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L. Ed.2d 481 by getting within 2% of the equality demanded by Art. I, § 2 (Deposition, pp. 13–14, 18).

■■ Defendants' evidence, consisting of the testimony of the party leaders in both houses of the 1967 Legislature, and the Chairman of the Senate Reapportionment Committee, was simply that many bills were introduced; that the one finally adopted had a stormy passage and was amended many times; and that finally it barely passed the House. Defendants contend that these facts demonstrate that this was the best bill, in respect to practicably equal population, that could be passed, and, therefore, attempt to argue that the division of population provided is, in fact, as "nearly equal as is practicable." [3] In

3. In spite of the fact that we expressly rejected defendants' political compromise arguments in *Preisler II* (see footnotes 7 and 20, and accompanying text on pages 968 and 980 of 257 F.Supp.) defendants and intervenors again contend that the 74th Missouri General Assembly produced the best possible bill that politics would permit. Defendants point to the fact that the "Majority and Minority Leaders of both Houses of the Missouri Legislature have testified that the 1967 Act is a reasonable legislative compromise." Intervenors again contend that

other words, defendants would have this Court hold that their definition of "practicable" is legally equivalent to "acceptable to a majority of the legislature." We reject that argument.

We find that defendants' evidence leads to the inevitable conclusion that a majority of the members of the Legislature were motivated by other considerations than the constitutional objective of "practicable equality." Our specific factual findings in regard to the 1967 Act and in regard to the rejection of better plans by the 1967 Missouri Legislature are fully stated in Appendix A made a part of this opinion by this reference. The legislative history and changes made by the 1967 Act in prior acts held to be constitutionally void are also there stated in detail, together with the facts concerning how the shifts of particular political subdivisions from one 1967 Act district to an adjoining district would have made both districts more nearly equal in population.

It is not necessary to restate the constitutional principles applied in *Preisler II*. That case was affirmed by the Supreme Court on January 9, 1967 and is the law of this case. The same day *Preisler II* was affirmed, the Supreme Court in Duddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 77 L.Ed.2d 508 (1967), vacated the judgment rendered in Grills

v. Branigin, S.D.Ind.1966, 255 F.Supp. 155, and remanded that case to the three-judge Indiana court for further consideration in light of Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[4]

Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), also decided January 9, 1967, although a state reapportionment case, nevertheless established burden of proof principles applicable to all reapportionment cases. Mr. Justice Harlan stated in his dissent, joined by Mr. Justice Stewart, that the burden of proof rule there established "stand[s] on its head the usual rule governing * * * the validity of legislative enactments, state as well as federal, which is, of course, that they come to us with a strong presumption of regularity and constitutionality" (supra, at 447, 87 S.Ct. at 574). Mr. Justice Harlan's strongly held conviction that "the burden of showing unconstitutionality should be left here, as in other cases, on the attacking party" was, of course, explicitly rejected by the majority of the Supreme Court.[5]

In Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 decided February 20, 1967, Mr. Justice Harlan and Mr.

"the 1967 Act is a reasonable legislative compromise and in fact the best that could be obtained as a practical matter." In reflective moments, we have pondered what response would be given by members of the General Assembly to an effort that would attempt to justify a refusal to enforce a law enacted by that legislative body on the ground that it was politically inexpedient, as a matter of practical politics, for the offender to have complied with such a law.

4. The full significance of the Supreme Court's affirmance of *Preisler II* and vacation of Grills v. Branigin's judgment must be assayed in light of *Preisler II's* express refusal to follow the rationale of Grills v. Branigin and that of still earlier cases, both federal and State, that attempted to apply standards other than those set forth in Art. I, § 2 of the Constitution as construed by Wesberry v. Sanders, to a congressional reapportion-

ment case. The cases in addition to Grills v. Branigin that this court expressly refused to follow in *Preisler II* were Bush v. Martin II, S.D.Tex.1966, 251 F.Supp. 484, Moore v. Moore, S.D.Ala.1965, 246 F.Supp. 578; Kirby v. Illinois State Electoral Board, N.D.Ill.1965, 251 F.Supp. 908, People ex rel. Scott v. Kerner, 33'Ill. 2d 460, 211 N.E.2d 736 (1965); and Levitt v. Maynard, 105 N.H. 447, 202 A.2d 478 (1964).

5. Mr. Justice Harlan has consistently and unsuccessfully advocated the view that the rules formerly applicable to judicial review of apportionment cases should still be the law. A good example of how the old rules were applied is illustrated by the judicial treatment given Missouri's constitutional command that Missouri's congressional districts "shall be composed of contiguous territory as compact and as nearly equal in population as may be."

Justice Stewart dissenting, the Supreme Court reversed a Texas three-judge court for the reason that:

Under that case [Swann v. Adams III], it is quite clear that unless satisfactorily justified by the court or by the evidence of record, population variances of the size and significance evident here are sufficient to invalidate an apportionment plan. Without such justification, appellants' analysis of H.B. 195 made out a sufficient case under the Fourteenth Amendment (supra, at 122, 87 S.Ct. at 820).

The basic contentions made by defendants in this case were accepted by the Texas three-judge court only to be rejected by the Supreme Court.

The impact of Swann v. Adams III and Kilgarlin v. Hill was immediate and consistent. All three-judge federal courts and state courts deciding congressional apportionment cases, with the benefit of either or both of those cases, have been able, with one exception, unanimously to determine every such case that has been decided this year. See Dinis v. Volpe, D.Mass.1967, 264 F.Supp. 425; [5a] Wells

---

Art. 3, Section 45, 1945 Missouri Constitution.

When Mr. Phillips, delegate from St. Louis, proposed that constitutional provision to the 1945 Missouri Constitutional Convention, he stated:

MR. PHILLIPS (of St. Louis City): * * * Mr. President, this Section is also Section 55 of the Constitution of the State of Virginia. It has been in the Virginia Constitution for over one hundred years and a great many of our redistricting statutes are exact copies of this language. Now, under the Constitution of the United States, Congress has the power to fix the times and places of holding elections for representatives, that is the State Legislature has that power and but Congress can alter these regulations. In 1911 Congress passed an act prescribing how the representative districts shall be made, but that act expired on the passage of the Act of June 18, 1929, which leaves no federal statute prescribing the manner in which state legislatures shall lay out the congressional districts. In the State of Illinois, the Legislature of Illinois made a horrible gerrymander. I have forgotten the exact facts, but I think one district had two or three times the population of the others and the Supreme Court of Illinois said that while they regretted the fact that they could not do anything about it, they did say that it was a terrible redistricting and that if they only had the power they would set it aside, but under the Act of Congress, why the Legislature, I mean under the Constitution of the United States, why the Legislature was free to do as it saw fit.

Now, on the other hand, the same thing happened in the State of Virginia. The Legislature of Virginia made a horrible gerrymander of the congressional districts and the Supreme Court of Virginia held that by reason of this provision in the Virginia Constitution, they were bound by the thing because Congress had enacted no law on the subject.

Now, Missouri has been a shining example of gerrymander of representative districts for years and years *and if we will put a thing like this in our Constitution, it will protect the people of our state against such a thing until Congress passes its own act.* (Emphasis ours). [Debates 1945 Mo.Const. Conv. pp. 5559–5565]

The 1945 Missouri Constitutional Convention included what it thought would protect the people of this State; but it is clear that the Supreme Court of Missouri did not agree. The Supreme Court of Missouri in its pre-Wesberry v. Sanders opinion in Preisler v. Hearnes, Mo.Sup.Ct. en banc 1962, 362 S.W.2d 552, approved the 1961 Reapportionment Act eventually held to be unconstitutional by this Court in *Preisler I*, on the now rejected theory that "courts may not interfere with the wide discretion which the Legislature has in making apportionments * * * when Legislative discretion has been exercised" (l. c. 555), and for the no longer valid reason that "any political compromise, for which there is any reasonable basis, is an exercise of legislative discretion that the courts must respect" (l. c. 557). Compare Footnote 12, infra. The refusal of the Supreme Court of Missouri to follow Brown v. Saunders, 159 Va. 28, 166 S.E. 105 (1932), the case to which Delegate Phillips made obvious reference, was the sort of rule that Mr. Justice Harlan has advocated in many of his dissents in apportionment cases. This Court, of course, is under duty to follow the majority and not the dissenting opinions of the Supreme Court.

**5a.** 36 Law Week 3243 states that an appeal was filed in Dinis v. Volpe, December 4,

v. Rockefeller, S.D.N.Y., 273 F.Supp. 984 (decided May 10, 1967, and not yet reported); [5b] Baker v. Ellington, N.D. Tenn. 1967, 273 F.Supp. 174; Civ.No. 3945; Gong v. Kirk, S.D.Fla.1967, No. 64–143 Civ.E.C., 278 F.Supp. 133; (decided August 2, 1967); Silver v. Reagan, Cal., 62 Cal.Rptr. 424, 432 P.2d 26, 1967; and Exon v. Tiemann, D.Nebr. decided November 22, 1967, 279 F.Supp. 603. The only split decision was that in Lucas v. Rhodes, N.D.Ohio 1967 (decided May 10, 1967). That case was reversed by the Supreme Court on December 4, 1967, 389 U.S. 212, 88 S.Ct. 416, 19 L.Ed.2d 423. The notion expressed in the majority opinion in the reversed Ohio case to the effect that "an element of 'practicality' is implicit in the concept of 'practicability' as that term is to be applied in a districting case" was implicitly rejected by the Supreme Court when it reversed that case in its one sentence per curiam opinion which cited only Wesberry v. Sanders.[6]

■■ The principle is firmly settled that the proponents of a redistricting plan must sustain the burden of justifying *any* deviation from practicable equality of population. Swann v. Adams, supra, 385 U.S. at 445, 87 S.Ct. 569, 17 L.Ed.2d 501; Reynolds v. Sims, supra, 377 U.S. at 577–580, 87 S.Ct. 1362;

**1967.** We are advised that the order appealed from was one entered by the Massachusetts three-judge court on October 3, 1967 which approved a 1967 Congressional Redistricting Act of the Massachusetts Legislature under which the smallest district deviated from the ideal by minus 4.524 population and the largest district deviated from the ideal by plus 4,192 population. Law Week indicates that the question presented for Supreme Court review is the "competency of malapportioned state legislature to establish congressional distr'cts in conformity with Fourteenth Amendment."

**5b.** The Supreme Court affirmed Wells v. Rockefeller (affirmed sub nom. Rockefeller v. Wells, 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651, No. 691, October Term, 1967) on December 18, 1967, by summary per curiam order. The Supreme Court's use of summary affirmance and reversals in Congressional apportionment cases, read closely with the rationale expressed by the lower courts, has provided a pattern that has been of substantial guidance to the lower courts in Congressional apportionment cases. Wells v. Rockefeller, for example, stated that the per curiam affirmance of [Kirkpatrick v. Preisler] *Preisler II*, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511 (1967), the per curiam reversal of Duddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 77 L.Ed.2d 508 (1967), and the per curiam in Swann v. Adams III, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), all decided January 9, 1967 were "determinative of the issues here." In *Preisler II*, for another example, this Court read the Supreme Court's summary dispositions in Martin v. Bush, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964), Drum v. Seawell, 383 U.S. 831, 86 S.Ct. 1237, 16 L.Ed.2d 298

(1966), and Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966), in a similar manner.

**6.** The Oxford Dictionary defines PRACTICABLE as "capable of being carried out in action; feasible." Webster's definition is "that may be practiced or performed; capable of being put into practice; done or accomplished; feasible; as a *practicable* method; a *practicable* aim; a *practicable* good." Webster carries a note that "Practicable, practical are sometimes confused. That is Practicable (opposed *impracticable*) which is capable of being accomplished; that is Practical (opposed to *theoretical* and the like) which can actually be turned to account. See POSSIBLE."
The Oxford definition for PRACTICAL is "1. Of, pertaining, or relating to practice; exhibited in practice or action. Opp. to speculative, theoretical, or ideal. 1617. b. Applicable in practice; practically useful. 1642. 2. Engaged in practice; practising, working. 1604. 3. Inclined to action (as opp. to speculation, etc.); also, having ability for action. 1667. 4. That is such in practice; that is such in effect, though not nominally or professedly so; virtual. 1642. 5. Crafty, scheming, artful Foxe * * * P. politics is to do what you can, and not what you ought. 1897."
Webster's definition states for PRACTICAL: "1. Of, pert. to, or consisting or manifested in, practice or action;—opposed to *theoretical, ideal* or *speculative;* as a *practical* question * * * 2. Available, usable, or valuable in practice or action, capable of being turned to use or account; useful; as a *practical* acquaintance with a language; practical economy."

Maryland Citizens Committee for Fair Cong. Redistr. v. Tawes, 253 F.Supp. 731, 733 (D.Md.1966), aff'd sub nom. Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966). This Court must also follow and apply Kilgarlin v. Hill's express requirement that before a particular plan may be approved as constitutional the District Court must be able, from the evidence adduced by the defendant, to articulate legally acceptable reasons for the specific variations in population between districts that have been shown to exceed the "as nearly as is practicable" standard of Art. I, § 2.

■ Both Swann v. Adams III and Kilgarlin v. Hill teach that courts can not refuse to adjudicate bona fide controversies concerning alleged abridgments of the constitutional right to an equal vote. The infrequent judicial use of the phrase *"de minimis"* in apportionment decisions cannot properly be converted into a generalized rationalization of variances that are shown, on the precise facts presented in a particular case, to have been both avoidable and greater than those variances that would have been produced by a more faithful application of Art. I, § 2's standard of "as nearly equal as is practicable."

Defendants' basic *de minimis* argument is not tenable. The phrase *"de minimis"* was first used in an apportionment case in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Mr. Justice Harlan there suggested that the variances in the 1901 Tennessee state apportionment were only *"de minimis"* from an apportionment formula established by the Tennessee Constitution. 369 U.S. at 335–336, 82 S.Ct. 773–774. Mr. Justice Clark countered by stating that Mr. Justice Harlan's efforts to justify those variances on "such generalities as 'classic legislative judgment,' 'no significant discrepancy,' and *'de minimis'* 'departures' [are shown by] even a casual glance at the present apportionment * * * to be entirely fanciful" (369 U.S. at 258, 82 S.Ct. at 732).

Only three lower federal courts have made reference to *"de minimis."* Cal-

kins v. Hare, E.D.Mich.1964, 228 F.Supp. 824, used the phrase in explaining and emphasizing why the "mathematical precision" caveat in Wesberry v. Sanders could not be used as "an escape hatch for the reluctant." (Id. at 829). This Court, in *Preisler II,* made similar explanatory use of the *"de minimis* doctrine." We stated that "use of such words as 'feasible' and 'practicable' in a careful statement of the fundamental constitutional principle constitutes but a recognition that the familiar doctrine of *de minimis* is applicable and is designed to make clear that a State legislature would not be expected to create entirely new political subdivision lines in order to have absolute and precise mathematical equality in its congressional districts" (257 F.Supp. at 973).

The third lower federal court case to mention *"de minimis",* however, attempted to give that phrase a definitive and fixed conceptual meaning. That case was Kilgarlin v. Hill, S.D.Tex., 252 F.Supp. 404. The majority opinion in that case attempted to create a burden of proof formula under which (1) *"de minimis"* variations were to be placed at one pole and considered to be constitutionally permissible, (2) *"per se"* variations were to be placed at the opposite pole and held to be constitutionally void, and (3) all cases in the middle area of the mathematical scale would be held to be constitutionally permissible unless the plaintiff was able to "negate the existence of any state of facts which would sustain the constitutionality of the legislation" (252 F.Supp. at 414).

That case was reversed by the Supreme Court. In reversing the Supreme Court simply held that the burden of proof rule established by Swann v. Adams III, which had not been decided when the Texas three-judge court attempted to establish a different burden of proof rule, was controlling. The Supreme Court did not deem it necessary even to discuss the elaborate lower court formula that included *"de minimis"* as a conceptual part of its involved legal theory of percentage and ratio justification. In fact, the only other mention

of the *de minimis* phrase by the Supreme Court, other than that noted in the concurring and dissenting opinions in Baker v. Carr, was in Swann v. Adams III, supra, 385 U.S. at 444, 87 S.Ct. 569. Mr. Justice White's use of *"de minimis"* was in precisely the same pattern as the explanatory use made of that phrase by Calkins v. Hare, and *Preisler II.* He simply stated that "mathematical exactness or precision is not required" because *"de minimis* deviations are unavoidable" (385 U.S. at 444, 87 S.Ct. 569). The lower federal court reversed by Swann v. Adams III had not even mentioned the words *"de minimis"* in its opinion. It is therefore obvious that no question concerning the phrase was presented to or placed in focus for Supreme Court determination by the appeal from that lower court decision.

We believe that the Supreme Court's reversal in Kilgarlin v. Hill is at least an implicit rejection of any notion that the judicial use accorded the phrase *"de minimis"* can be converted into either an exception to the burden of proof rule so recently established by the Supreme Court in apportionment cases or as an independent defense that may, without proof, be said to justify variances greater than those that would have been created by better plans in fact presented to but rejected by a legislature or those created by similar plans that may be presented to a court in the trial of an apportionment case. We know of no court, state or federal, with the sole exception of the reversed Texas three-judge court, that has ever expressed a contrary idea concerning the very place that the *"de minimis"* phrase occupies in the constitutional law applicable to apportionments. *"De minimis,"* we suggest, belongs where Mr. Justice Clark put it in his concurring opinion in Baker v. Carr; among discarded generalities such as "classic legislative judgment" and "no significant discrepancy." [7]

So long as counsel representing State legislatures attempt to get courts to convert the infrequent judicial use of the phrase *"de minimis"* into some sort of numerical formulae under which ratios or percentage deviations fixed in one case become the rule in another for purposes of an attempted measurement of "how much variance can we expect to get away with," the whole thrust of the Supreme Court's apportionment cases is misconceived. Indeed, the whole thrust of many earlier Supreme Court cases, decided before the apportionment cases were decided, is ignored.

Gray v. Sanders, 372 U.S. 368 at 379–380, 83 S.Ct. 801, at 808, 9 L.Ed.2d 821, held long before either Reynolds v. Sims and Wesberry v. Sanders were on the books, that "the concept of 'we the People' under the Constitution visualizes \* \* \* equality" and that "the idea that every voter is equal to every other voter in his State \* \* \* underlies many of our decisions."

All the Supreme Court's apportionment cases from Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) to the present time teach that a particular apportionment case must be held to present a bona fide justiciable controversy and that a congressional apportionment plan cannot be approved by a lower court as constitutional unless the variances above those which result mathematically from the application of the "as nearly as is practicable" standard did in fact result from and are justified by the application of a legally acceptable principle of rational State pol-

---

7. It is of interest to note that Mr. Justice Harlan would not have had any difficulty at all in affirming Swann v. Adams III. The avoidable variances involved in that Florida apportionment plan looked to Mr. Justice Harlan's tolerant eye as "relatively minor variations in population among some of the districts" 385 U.S. at 447, 87 S.Ct. at 574. The Supreme Court's consistent rejection of the "classic legislative judgment" generality prohibits approval of a plan with avoidable variances, by vague and subjective judicial classifications, unsupported by any evidence, on the firmly rejected theory that such variances are nevertheless to be treated as being of "no significant discrepancy" or as " 'de minimis' departures." Such was the very purpose of Swann v. Adams' burden of proof rule.

icy. The burden of proof to so establish rests upon the defendant.

■■■■ When it becomes apparent, therefore, from the facts presented in a particular case, that the apportioning body could have districted the particular state in a substantially more nearly equal manner, without doing violence to any articulated legally acceptable state policy, consideration of *de minimis* is at an end in that particular case.[8]

Kilgarlin v. Hill based its reversal on the dual ground that the lower court had not applied the proper burden of proof rule and upon its failure to "articulate any satisfactory grounds for rejecting at least two other plans presented to the court, which respected county lines but which produced substantially smaller deviations" (386 U.S. supra, at 124, 87 S. Ct. at 823).

The undisputed and unexplained facts of this case show (a) that the 74th Missouri General Assembly did not in its 1967 Act in fact provide districts which "as nearly as is practicable one man's vote for a congressional election is * * worth as much as another's;" (b) that the 1967 Missouri Legislature in fact rejected plans that came much closer to so doing; and (c) that any number of shifts of political subdivisions including counties, to say nothing of townships, wards and precincts, would have produced a congressional districting plan that would have been in closer compliance with the constitutional command of Art. I, § 2.

In *Preisler II* we took detailed notice of more practicable plans that had been proposed to and rejected by the 1965 Missouri General Assembly. The 1967 74th General Assembly enacted a bill that malapportioned this State in a manner more extreme than the plan proposed to the 1965 Legislature as Senate Committee Substitute for Senate Bill No.

320, to which this Court devoted detailed attention in *Preisler II*. Table IV on page 964 of 257 F.Supp. reflects a comparison of the changes proposed by that rejected 1965 plan with those finally enacted by the 1965 Legislature. The 1967 Legislature's action in enacting its 1967 Act was taken in the face of the express caveat stated in *Preisler II* that our discussion of the better plan rejected by the 1965 Legislature was not to be construed by a future Missouri General Assembly as an approval of the rejected plan but only to show that the 1965 Act did not in fact comply with the constitutional standard.

The fact that the 1965 Legislature could have adopted a more practicable plan with districts more nearly equal in population had it not rejected Senate Committee Substitute for Senate Bill No. 320 was demonstrated by our discussion in *Preisler II*. The fact that the 1967 Legislature could have done the same thing demonstrates that its 1967 Act was not a plan that represented the most faithful application of the "as nearly equal as is practicable" standard. The rejected 1965 plan obviously would have produced variances that departed less from the ideal than those created by the 1967 Act. Our discussion of the rejected 1965 plan is not to be taken by a future Missouri Legislature as any intimation that such rejected plan, if adopted, would pass constitutional muster. Determination of that question would turn upon the sufficiency of the evidence adduced by defendants to justify and explain the quite obvious and substantial variances contained in that plan.

The 1967 Missouri Legislature rejected a better plan than that presented to the 1965 session of the Legislature. House Bill No. 870, proposed to and rejected by the 1967 Missouri General Assembly, provided districts that varied substantially less from the ideal than

---

8. What has been said in the text is not to be read as suggesting that we believe it "possible to draw congressional districts with mathematical precision" Wesberry v. Sanders, supra 376 U.S. at 18, 84 S.Ct. at 535, 11 L.Ed.2d 481. Indeed, what is said is in recognition of the fact that congressional districts cannot be so drawn and that a plan not so drawn is not necessarily one that would not pass constitutional muster. Each case must be judged on its own facts.

any bill ever before proposed to any Missouri Legislature. It is also apparent that particular districts containing populations much closer to the ideal than those eventually created by the 1967 Act were proposed by earlier versions of Senate Bill No. 182, as that bill progressed toward final passage, and by still other bills, all of which were rejected by the 1967 Missouri Legislature.

Our detailed findings concerning House Bill No. 870 and the other better plans rejected by the 1967 Legislature that demonstrate how Missouri could have been divided into ten districts of more practicably equal population than those provided in the 1967 Act are made in Appendix B which is incorporated in this opinion by this reference. We find that the variances produced by those better plans are in fact substantially less than those created by the 1967 Act. Our discussion of those better plans is solely for the purpose of demonstrating that the 1967 Act was not in fact the most practicable plan that could have been enacted. We intimate no judgment on the question of whether House Bill No. 870 or any of the other plans discussed would or would not pass constitutional muster for the reasons that have been sufficiently stated.

■■■ The prime difficulty with all three of the past reapportionment efforts of the respective Missouri Legislatures in the years 1961, 1965, and 1967 has been that the task has not been approached with an understanding that, since Wesberry v. Sanders, no State legislature in the United States can unnecessarily abridge one's right to an equal vote in a congressional election any more than it may constitutionally deny one his right to trial by jury, his right of free speech, his right to freedom of religion, his right of peaceful assemblage, or any one of his many other rights guaranteed by the Constitution of the United States. Indeed, the discharge of this delicate and quite fundamental constitutional duty has been treated by three successive Missouri legislatures as a legislative step-child; apparently qualification for appointment to the committees which have unsuccessfully attempted to do the actual work seems to have been limited to those who insist upon believing that something less than full performance of the dual mandates of the Missouri and federal Constitutions is all that is required.

It was explicitly held in Wesberry v. Sanders that "Our Constitution leaves no room for classification of people in a way that unnecessarily abridges" their right to an equal vote in a congressional election (376 U.S. at 17, 84 S.Ct. at 535.

■■■ Legislation implementing the command of Art. I, § 2 must divide the population into districts in which "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's" (376 U.S. at 7-8, 84 S.Ct. at 530). Those who have been responsible for the drafting of Missouri's three congressional redistricting plans have adamantly refused to recognize that these constitutional principles are as binding on all State legislatures of the United States as upon all State and federal courts.

The facts established in the three cases decided by this Court demonstrate that in all three legislative efforts the leadership of both political parties in the Senate and the House were given nothing better to work with than a makeshift bill produced by what has been candidly recognized to be no more than that deemed to be an expedient political compromise. And even that was not furnished until the closing hours of the session when nothing could have been done to either discover or correct even obvious errors.

■■■ This Court repeats for the third time that the Constitution does not leave room for intentional 85%, 95% or even 98% compliance with its mandate; that Art. I, § 2 commands equality of population in congressional districts "as nearly as is practicable;" and that any enacted plan that fails to comply with that constitutional standard, unless otherwise justified by substantial evidence in ac-

cordance with applicable law, is constitutionally void.

■ This Court obviously has no alternative other than to deny defendants' pending motion for the reasons that (1) we must find that the 1967 Act does not in fact divide the population of Missouri into districts as nearly equal as is practicable; and (2) because the obviously avoidable population variances in the 1967 Act can not be satisfactorily justified on any legally acceptable ground supported by any evidence in this record. It is therefore totally impossible for this Court, on the basis of any substantial evidence, to relate any "declared justification to any specific inequalities among the districts" or to "articulate any satisfactory grounds for rejecting * * * other plans presented [both] to the court [and to the 74th General Assembly of Missouri] which produced substantially smaller deviations" than those created by the 1967 Act. Kilgarlin v. Hill, supra, 386 U.S. at page 124, 87 S.Ct. 820, 823. Defendants have simply failed to carry the burden of proof imposed on them by Swann v. Adams III, a case decided before Senate Bill No. 182 was introduced

in the 1967 Missouri Legislature. We so find and determine.

Defendants' pending motion should be and will therefore be denied. Because of the public interest involved in this, as in all State and congressional apportionment cases, we have attached as Appendix C our discussion of all the contentions presented by either the defendants or by the intervenors that have not been explicitly answered in the body of this opinion.

## II.

There remains the question of remedy. Significant developments have occurred since *Preisler II* was decided that could in the near future require that our order of August 5, 1966 be appropriately modified. That order, consistent with the applicable congressional statute then in effect required that Missouri's congressional delegation be elected at large.

In *Preisler II* we directed specific attention to the fact that a "failure of the Missouri General Assembly to properly redistrict after the 1930 census forced the election of Missouri's entire congressional delegation to be held at large in 1932" (257 F.Supp. at 955).[9] We also noted

9. Almost all of the witnesses in *Preisler III*'s hearing expressed grave concern about the prospect of electing Missouri's Congressional delegation at large. It probably is only of historical interest to note that at one point in Missouri's history one used fighting words if he suggested that Missouri elect her congressmen by any other method than by elections at large. Every Missouri Representative to Congress was elected at large until 1847. The Congress, by its Act of June, 1842, provided that all members of the House of Representatives "be elected by districts composed of contiguous territory * * *; no one district electing more than one Representative" (5 Stat. 491 (1842)). Missouri, in the face of that Congressional command, continued to elect its representative (5 Stat. 491 (1842)). Mississippi, and New Hampshire. The Twenty-eighth Congress was therefore faced with the problem of dealing with this recalcitrance.

Violent controversy arose in the Congress, the upshot of which was that the Congressmen elected at large were permitted by the Democratic majority to

serve out their terms. James Butler Bowlin, elected at large from Missouri on the Democratic ticket, took the position that the Congress had no right or power to tell Missouri that she could not elect her Congressional delegation at large. That Missouri Congressman, on page 189 of the Appendix to the Congressional Globe, 28 Cong. 1st Sess., said: "Concede for a moment that Congress can district the States for the election of its own members, and you surrender enough to enable it to perpetuate its power forever." Alexander Stephens of Georgia, later Vice President of the Confederate States of America, elected at large from Georgia, took a similar position.

Missouri Congressman Bowlin vehemently protested against Congressional abolition of elections at large (under which application of the one-man—one-vote principle is automatic) and against creation of election districts by Congress where that body could command that "St. Louis should elect one representative, and the whole south and southwest of the State should elect another, making one vote in St. Louis equal to four or five in the

that Missouri had been fully advised "over thirty years ago that a Missouri General Assembly's failure to reapportion congressional districts in accordance with law required that 'unless and until new districts are created, all Representatives allocated to the state must be elected by the state at large'" (257 F.Supp. at 981), quoting from Smiley v. Holm, 285 U.S. 355 at 374–375, 52 S.Ct. 397, 76 L.Ed. 795 (1932). Carroll v. Becker, Secretary of State, 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807, which compelled Missouri's 1932 congressional elections at large, was decided on the authority of Smiley v. Holm and made application of the congressional statute in effect at that time and still in effect at the time *Preisler II* was decided.

Our order of August 5, 1966 was made, as stated in *Preisler II*, pursuant to the Congressional "command of Section 2a(c) of Title 2, United States Code, enacted pursuant to Art. I, § 4 of the Constitution of the United States" (257 F.Supp. at 981). That section of the United States Code was enacted as a part of the Act of June 18, 1929 (46 Stat. 26). As we also noted in *Preisler II*, Wood v. Bloom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932), held that Congress had failed to reenact any legislation requiring the election of Representatives from districts when it refused to include the provisions of the Act of August 8, 1911 (37 Stat. 14) in its Act of June 18, 1929.

Indeed, the latter Act, inconsistent with legislation that had required Representatives to be elected from districts since the Act of 1842 (5 Stat. 491), expressly provided that in the event a State failed to properly redistrict after a *decrease* in the number of Representatives apportioned to that State, the Representatives of such State "shall be elected from the State at large" (Section 2a(c) (5), of Title 2, United States Code).

Section 2a(c) did not require an election at large in the event a State failed to reapportion in cases in which the State either *gained* or *stayed the same* in the number of Representatives apportioned to it after a decennial census. It was for these reason that federal three-judge courts in Maryland and Tennessee, for examples, were not prevented by congressional mandate from redistricting those particular states by court order.

The Supreme Court's reversal of the Indiana three-judge court in *Grills*, and the affirmance of *Preisler II* last January, of course, focused Congressional attention on the fact that the Act of June 18, 1929 was indeed a Congressional command to the federal three-judge court in Indiana and to this Court to order elections-at-large in the event the Legislatures of Indiana and Missouri should fail to pass a constitutional redistricting act in time for the 1968 elections. The order of this Court, of course, expressly so provides.

Recent Congressional developments reveal that long standing efforts to reenact the 1842 requirement for district elections in the present Congress seemed doomed to the same failure suffered by similar efforts in every Congress over at least the past fifteen years.[10] But, most recently, the 1842 requirement was successfully attached as a rider to a private immigration bill for the relief of one Dr. Ricardo Vallejo Samala, 81 Stat. 581 (H.R. 2275, 90th Cong., 1st Sess.) The

country; because that would be a gross and palpable invasion of the franchise itself." Missouri finally decided to comply with the Act of June, 1842 four years later and, except for the 1932 election, all of Missouri's Representatives to Congress have been elected by districts from 1846 to date. We have heard no protest against the possib'lity of malapportioning Missouri in favor of its urban population since 1844. But should that day come, judicial relief will be available to those whose constitutional right to an equal vote is abridged.

10. In his Message of January 9, 1951 President Truman proposed that the 1842 election from districts requirement be reenacted by the Congress. H.R. Doc. 36, 82nd Cong., 1st Sess. President Truman's proposal was consistently incorporated in a series of bills introduced by House Judiciary Chairman Emanuel Celler, none of which have been enacted. See *Congress and the Nation* 1945–1964. published by Congressional Quarterly at page 1529.

It is of more than historical interest to note that Congressman Celler, writing in

rider, in the precise language of the Act of June, 1842, provides that "there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative * * * ". That private bill, with its attached rider, passed the House on November 28, 1967, passed the Senate on November 30, 1967, and became law on December 14, 1967 when it was signed by the President. See Congressional Record: November 28, 1967, H15901 and November 30, 1967, S17458.

■ When that legislation became law, this Court was relieved of the prior existing Congressional command to order that the 1968 and succeeding congressional elections in Missouri be held at large. This Court, therefore, will be free, in the event no constitutional plan is enacted at the coming Special Session of the Missouri Legislature, to direct appropriate proceedings that will enable it to make an appropriate redistricting order. In the event it should become necessary for this Court to exercise that power we shall follow procedures similar to those that were followed by other three-judge federal courts that have drawn congressional districts for particular states.

Judge Matthes, in his concurring opinion in *Priesler II,* stated that:

We have emphasized that the responsibility for enacting a constitutionally permissible redistricting plan rests on the Legislature of Missouri. Although the task may be fraught with difficulties, certainly it is not an impossible one. We are convinced that a conscientious effort, motivated by a desire to satisfy the requirements of the federal and State constitutions, will result in the formulation of congressional districts which will comport with the demands of the Constitution of the United States and the Constitution of Missouri (supra, 257 F.Supp. at 982).

That statement continues to reflect the view of this Court. We would be hopeful that all appropriate steps will be taken by all responsible persons to the end that a constitutionally valid redistricting plan be presented to this Court in order that it not be required to take further action in this case. Should it become apparent that further action is necessary, we shall, as we must, and on our own motion, direct further appropriate proceedings in this case.

For the reasons stated, we find and determine that the 1967 Missouri Congressional Reapportionment Act presented by defendants' pending motion does not pass constitutional muster. It is therefore

Ordered that defendants' pending motion should be and is hereby denied. It is further

Ordered that the judgment and decree of this Court entered August 5, 1966 should be and are hereby ordered to remain in full force and effect, subject,

1952, long before Baker v. Carr or Wesberry v. Sanders had been decided, stated that "the problem of [congressional apportionment] is one which involves the fundamental principle of equality which permeates our entire Constitution so that its denial imperils the very heart of our democracy" (17 Law. & Cont.Prob. 268 at 274). He also stated that "a mere glance at the contours of various congressional districts and the wide variances in the population of these districts compels the conclusion that the drawing of congressional districts cannot be left to the whims and uncontrolled discretion of the states' legislatures" (op. cit. supra, at 274), adding that "the history of apportionment in the United States, particularly since 1842 when standards were established for congressional districts, indicates conclusively that the one single factor that has always been lacking has been that of enforcement" (op. cit. supra, at 274–275). He therefore advocated in 1952, more than a decade before Wesberry v. Sanders, that the Congress provide for "judicial review of the apportionment acts of states' legislatures in the United States district courts" (op. cit. supra at 275). Wesberry v. Sanders obviated the necessity for any congressional action in that regard.

however, to future appropriate modification. It is further

Ordered that any filings for the House of Representatives of the United States Congress that may have already been made under and pursuant to the 1967 Missouri Congressional Reapportionment Act should be and are hereby declared to be null and void, that no further filings be accepted under that Act, and that any and all future action that may be taken in connection with any filings that may have been made should be and will be considered a violation of the order of this Court. It is further

Ordered that pursuant to Rule 56(c) of the Rules of Civil Procedure, this opinion and the appendices attached thereto shall serve as our findings of fact and conclusions of law. It is further

Ordered that jurisdiction of this cause be retained for the purposes that have been stated.

### APPENDIX A

FACTUAL FINDINGS IN REGARD TO 1967 ACT AND REJECTION OF MORE PRACTICABLE DISTRICTS, INCLUDING PRACTICABILITY OF SHIFTS OF POLITICAL SUBDIVISIONS

We follow the pattern of *Preisler II* in making our specific findings of fact in regard to the 1967 Act. Appendix A attached to *Preisler II* at page 983 of 257 F.Supp. illustrated the changes made by the 1965 Legislature in the 1961 Act held void in *Preisler I*. The undisputed facts in *Preisler III* establish that the changes made by the 1967 Legislature in the 1965 Act held void in *Preisler II* follow precisely the same pattern followed by the 1965 Legislature in its modification of the 1961 Act.

Change "A" on *Preisler II*'s Appendix A showed that Mercer County (pop. 5,750) was shifted by the 1965 Act from District 9 to District 6. The 1967 Act added to that same shift the counties of Grundy (pop. 12,220); Putnam (pop. 6,999) and Sullivan (pop. 8,783) with a total population of 28,002.

The 1967 shift of additional rural population from District 9 to District 6 in the 1967 Act commanded still further invasion of the urban population in the St. Louis metropolitan area in exactly the same pattern of invasion established by the 1965 Act.

While the overvaluation of District 6 was reduced to −9,743 by the 1967 Act, it is perfectly obvious that had Schuyler County (pop. 5,052) been added to the 1967 shift from the District 9, the variance of District 6 would have been reduced to a variance of −4,691. The inclusion of Schuyler County in the 1967 shift was in fact proposed to the 74th General Assembly in Senate Bill No. 182 as that bill was originally introduced; remained there in the Senate Substitute for Senate Bill No. 182, and was removed from the perfected Senate Committee Substitute for Senate Bill No. 182 only when the shift of Adair and Macon Counties was proposed. Had the plan proposed in the Senate Committee Substitute for Senate Bill No. 182 been adopted District 6 would have had a variance of only +268.[11]

---

11. We discuss elsewhere the legal consequence of defendants' failure to adduce evidence that the 1967 Legislature in fact took population trends into consideration. See Part I of Appendix C.

The undisputed facts show that the reason why the population of the rural District 6 was for the third successive time overvalued by a Missouri Legislature could not have been that the Legislature actually believed that district contained "areas with rapid population growth since 1960 and such population growth was taken into consideration," as defendants attempt to argue. An examination of population trends in the northwestern Missouri counties between 1950 and 1960 and since shows that, except by invading the population of Kansas City, Missouri by putting the population contained within its city limits into three separate congressional districts, the Fourth, Fifth and Sixth, the entire geographical area included in District 6 under the 1967 Act, i. e., all of the geographical area outside the city limits of Kansas City, had a net loss in population between 1950 and 1960. Every county included in District 6 lost population except Platte, Clay and Ray Counties. Ray County's gain was 143.

Change "B" illustrated in *Preisler II*'s Appendix A stated that the 1965 Act shifted several Kansas City wards from District 4 to District 5. The 1967 Act's shuffle of Kansas City wards, quite by accident, brought the variance of District 5 to within –803 of an ideal district of 431,981. Such a variance, if it could be separately considered, would apparently be within constitutional range. But congressional apportionment plans can not be viewed piecemeal; they must be viewed as a whole. The 1967 shifting of Kansas City ward population of 25,398 to District 5 required that additional population be added to District 4 which was already 29,168 deficient before the shift. Accordingly, more populous Saline County (pop. 25,148) was shifted from District 8 and St. Clair (pop. 8,421) and Benton (pop. 8,737) Counties were shifted from the deficient District 7—a total addition of only 42,306. The 1967 shift resulted in a reduction of the minus variance in the 1967 Act's District 4 to –12,260.

But, once again, it is perfectly obvious that had Howard County (pop. 10,859) been included in the shifts made by the 1967 Act the variation of District 4 would have been further reduced to –1,401. The inclusion of Howard County in District 4 was specifically proposed to the 1967 General Assembly along with Saline and other counties in Senate Bill No. 182 as that bill was originally introduced. Had that plan not been rejected and had proper, unquestionably practicable, allocation been made concerning the wards of Kansas City, both Districts 4 and 5 would have had variances of only –639 and –640, respectively.

Change "C" on *Preisler II*'s Appendix A illustrated the 1965 Act's shuffle of "several St. Louis wards and St. Louis County townships * * * among the First, Second, Third, and Ninth Districts." The same sort of shuffle was made in the 1967 Act; only more so. Under the 1967 Act St. Louis County was fragmented into five, rather than four separate congressional districts. The reason why further invasion and fragmentation of the population of the St. Louis metropolitan area was necessary is obvious.

In order to improve the 1965 Act's treatment of District 4, the 1967 Act shifted population formerly in District 8. Similar depletion of District 8's 1965 allocation of population was rendered necessary in order to bring the rural District 10's 1967 allocation of population closer to the ideal. The architect of the 1967 Act frankly stated that the attempt of the 1967 Legislature to use the population allocated to District 8 under the 1965 Act to bolster the deficient population of adjoining districts under the 1967 Act was "just like squeezing a sponge" so far as District 8 was concerned (Dep. p. 13).

Although he did not know it at the time, the author of Senate Bill No. 182 actually had more water in District 8 than he thought he had. Because he used population figures from a still unidentified source, the Chairman of the Senate Committee was under the erroneous impression that District 8 was being allocated only 8,003 excess population under the 1967 Act. The 1960 census figures establish that an excess of 13,542 population was actually placed in District 8 by the 1967 Act. It is therefore apparent that it was neither practicable nor even necessary for the 1967 Act to have extended the boundaries of District 8 to the city limits of St. Louis. But even if the invasion of the St. Louis metropolitan

---

Very substantial parts of Clay and Platte Counties are inside the city limits of Kansas City. The net population loss for all counties included in District 6 was 40,467. The net gain in Platte, Clay and Ray Counties between 1950 and 1960 was 50,773. But of that gain, only approximately 12,043 was produced in areas outside the Kansas City limits. It is thus apparent that excluding the population of Kansas City within its city limits there was a net population loss of 28,424 for the area included in District 6; facts that hardly support the reason assigned by defendants in their brief for the drawing of that District's lines. We find that the 1967 Act robbed Kansas City of population within its city limits for the same obvious reasons that like robbery was attempted in the 1961 and 1965 Acts.

population could be justified, which is impossible on the facts presented, it is obvious that a shift of Howard County (pop. 10,859) from overpopulated District 8 to either of the adjoining and underpopulated Districts 4 or 6 would have most substantially reduced the variations of those transferor and transferee districts.

In further specific regard to the 1967 Act's shuffle of St. Louis wards and St. Louis County townships we find that the 1967 Missouri General Assembly, like the 1961 and 1965 Missouri General Assemblies, attempted to disregard and ignore basic population data that will not go away. The 1960 census figures make it obvious that the City of St. Louis with its 1960 population of 750,026 needed to have added only 113,936 additional population to entitle that total population to two ideal congressional districts. It cannot be validly argued that it was not practicable for the 1967 Legislature to have created two districts with extremely small variations without violating the integrity of political subdivisions as large as townships, to say nothing of violating ward lines as practiced in the 1967 Act. For example, and only for example, the addition of the populations of the townships of St. Ferdinand (pop. 66,420), Hadley, (pop. 24,720), and Lincoln (pop. 22,380) in St. Louis County to the population of the City of St. Louis would have provided sufficient population for two congressional districts, each of which would have varied only −208 from the ideal. The drawing of the line to divide that 864,378 population into two congressional districts as nearly equal as practicable was in fact an extremely easy task because the 74th General Assembly established no policy that prevented its use of existing precinct lines, at least in the metropolitan geographical areas of Missouri for use in dividing the two districts.

Urban precincts, generally regulated as they are by the number and capacity of voting machines assigned them, necessarily have relatively small populations. The ability to shift precincts from one side of a district dividing line to the other makes it entirely practicable to get exceedingly close to equal populations for adjoining districts as was demonstrated in the Jackson and Clay County apportionments to which attention was directed in *Preisler II* (257 F.Supp. at 978, footnote 16). The Kansas City Star for December 5, 1967 reports that the new boundary lines for the Kansas City School Board divided the population within that school district "into six subdistricts each with about 71,500 population." Local government public officials in this judicial district have consistently demonstrated that the one man-one vote constitutional principle can be applied without difficulty given the desire so to do.

The particular St. Louis townships mentioned have been used solely for illustrative purposes. That use, however, supports our factual finding that it was in fact entirely practicable for the 1967 Legislature to have created two compact and contiguous congressional districts in the St. Louis metropolitan area in accordance with the command of the Missouri Constitution that would have in fact avoided all except exceedingly small variations for two of the congressional districts to which that population was by law entitled.

We make the same finding in regard to how a third congressional district could have been formed from the 1960 population situated in the remaining portion of St. Louis County. Such a third congressional district could not have included all of the remaining townships in the only charter county in the State that would have been left unassigned in the example just stated in regard to how two practicable St. Louis metropolitan congressional districts could have been created; the most northerly townships of St. Louis County would necessarily have to have been assigned to still a fourth congressional district, some of which would have included a part of "outstate" Missouri.

The practicable third district that could have been made to adjoin the area described for the first two practicable districts, with full observance given an

assumed established policy against cutting township lines outside of metropolitan cities, would have included the following townships of St. Louis County:

## TABLE SHOWING HOW A THIRD PRACTICABLE DISTRICT COULD HAVE BEEN CREATED USING ST. LOUIS COUNTY 1960 POPULATION

| St. Louis County Township of: | 1960 Population |
|---|---|
| Lemay | 40,095 |
| Concord | 36,273 |
| Gravois | 52,205 |
| Jefferson | 35,649 |
| Clayton | 51,092 |
| Creve Coeur | 48,681 |
| Midland | 50,417 |
| Washington | 19,304 |
| Normandy | 37,673 |
| Bon Homme | 53,779 |
| Meramac | 9,528 |
| Total Population | 434,696 |
| Ideal District | 431,981 |
| Variance | +2,715 |

Whether the plus variance of 2,715 indicated in the above table would, on the facts, be "as nearly equal as is practicable" would, of course, be entirely dependent upon the proof adduced in any case in which such variance might be challenged. As Chief Justice Weintraub noted in Jones v. Falcey, 48 N.J. 25, 222 A.2d 101 at 108, one of the valid teachings of Meeks v. Avery, D.C., 251 F.Supp. at 251, is that where "a pattern is disclosed in which the integrity of political subdivisions is ignored, then the districts could be formed with population substantially equal in each of them; and when * * * lines [are] completely disregarded in * * * many instances the court [is] justified in holding that a pattern had developed in which the integrity of political subdivisions was ignored."

■ That sound principle merely says that a State legislature must practice what it preaches. A State legislature should therefore anticipate that a purported State policy of observing particular political subdivisions lines can not be relied upon to justify variances above those which would have been created by proper application of the "as nearly as is practicable" principle unless the legislature's enacted plan does in fact observe and apply such an articulated State policy.

The evidence in this case establishes that the township lines of St. Louis County were in fact broken by the 1967 Act; precinct lines were in fact used to define the boundaries of particular congressional districts created by the 1967 Act. It is therefore not necessary to apply the principle of Jones v. Falcey, supra, to the factual situation presented in *Preisler III* because the avoidable variances created by the 1967 Act's Districts 1, 2, and 3 of +7,765, +4,467, and +4,118, respectively, are far above the variances that would have been created had the 1967 Legislature in fact established and followed the less stringent policy of recognizing townships and ward lines.

Change "D" in Appendix A to *Preisler II* illustrated how the 1965 Legislature changed the allocation of population made in its 1961 Act to District 7. We there noted that the 1965 Missouri Legislature

had shifted only Barton County (pop. 11,113) from District 7 to District 4. As noted above, the 1967 shuffle of Kansas City's wards made it necessary to shift St. Clair and Benton Counties from District 7 to District 4. Defendants' hearing Exhibit A, the map used by the majority leader of the House, shows that those particular counties, along with other counties involved in other shifts made by the 1967 Act apparently were the subject of some sort of special discussion because those counties were shaded with a lead pencil.

The problem created by the shift of St. Clair and Benton Counties required that the 1967 Legislature shift additional population into District 7. Once again the population allocated to District 8 under the 1965 Act had to be "squeezed like a sponge." Camden (pop. 9,116) and Laclede (pop. 18,991) Counties (both of which were pencil shaded on the House majority leader's map) were shifted from old District 8 with a resultant total net gain of 10,949 population for District 7. That shift produced a +4,788 variance under the 1967 Act.

But this Court must face the undisputable fact that the addition of Hickory County (pop. 4,516) to the 1967 shift from old District 7 to new District 4, would have reduced new District 7's variance to a +278 and would have, at the same time, reduced the variance of new District 4 from a –12,260 to a –7,754.

Hickory County was in fact proposed for inclusion in District 7 in several versions of Senate Bill No. 182 as that bill progressed through the 1967 Missouri Legislature. Indeed, the Senate Substitute for Senate Bill No. 182 made provision for a District 7 that included Hickory County in which the variation from the ideal district was –1,292, a substantially smaller variation than that eventually created by the 1967 Act.

Change "E" noted in *Preisler II*'s Appendix A reflected the 1965 Act's shift of Wayne County from the 1961 Act's District 8 to that Act's District 10. Following the same pattern established in 1965, the 1967 Legislature shifted the additional and quite sparsely populated counties of Shannon (pop. 7,087), Carter (pop. 3,973), Reynolds (pop. 5,161), Iron (pop. 8,041), and Madison (pop. 9,366) to form the 1967 Act's District 10. The 1967 Act's additional shift reduced the greatest minus variation of the 1965 Act only to a minus variation of 8,113. The undisputable facts establish that had Dent County (pop. 10,445) been added to the 1967 shift, the variance of new District 10 would have been reduced to +2,332. That shift would have also had the effect of reducing the variance in adjoining new District 8 to +3,105. We further find that House Committee Substitute for Senate Committee Substitute for Senate Bill No. 182 was proposed to and rejected by the 1967 Missouri General Assembly. That plan proposed the inclusion of Dent County in the 1967 shift (together with every other one of the other five counties that were in fact shifted by the 1967 Act). Acceptance of that proposed and rejected plan would have produced a variance of +1,064 for new District 10.

The 1967 Missouri Legislature was required to put the squeeze on old District 8 to provide new District 10 the population assigned it by the 1967 Act. The 1967 Act's shift of additional rural counties from old District 8 to new District 10 was compensated for by siphoning still more population from the St. Louis metropolitan area. The 1967 Legislature invaded St. Louis County population by extending the boundaries of still a fifth congressional district to include part of that County. The 1967 Act added Concord and Meramac townships and particular precincts in Bon Homme in St. Louis County to new District 8.

The addition of that portion of St. Louis County by the 1967 Act caused new District 8 to stretch from the city limits of St. Louis to within less than 75 miles of the city limits of Kansas City. Thus, in total disregard of the duty to draw compact and contiguous districts placed on it by the Missouri Constitution, the 74th General Assembly added the population of urban St. Louis

County to an essentially rural district in order to balance out the population of the five rural counties shifted from old District 8 to new District 10 by the 1967 Act. For the applicable Missouri law on gerrymander, see State ex rel. Barrett v. Hitchcock, 1912, 241 Mo. 433, 146 S.W. 40,[12] and Preisler v. Doherty, 1955, 365 Mo. 460, 284 S.W.2d 427. Compare Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), for circumstances under which gerrymandering can become a federal question.

In *Preisler II* we found as a fact that "the discrimination against the St. Louis metropolitan area, evidenced by the 1961 Act, was continued under the 1965 Act" (257 F.Supp. at 958, fn. 4). We find that the 1967 Act continues the same discrimination. We found in *Preisler II* that under both the 1961 Act and the 1965 Act "the City of Kansas City was split between three separate Congressional districts," and that under both acts the "population of the City of Kansas City * * * continued to be utilized to increase the deficient population of two essentially rural districts" (257 F.Supp. at 960). We make the same finding in regard to the use of Kansas City's Platte and Clay County population in regard to District 6 created by the 1967 Act. In *Preisler II* we found that the 1961 Act and the 1965

Act "both have the same pattern of over-valuation and overweight of the votes in the rural geographical areas, as contrasted with the votes in the two metropolitan areas of the State" (257 F. Supp. at 960). We make the same finding in regard to the 1967 Act, particularly as it applies to the St. Louis metropolitan area and the area of Kansas City north of the Missouri River.

In *Preisler II* we found and held that "all that the Seventy-third General Assembly did [in its 1965 Act] in regard to the 1961 Act held constitutionally impermissible in *Preisler I* was to move three small counties from one district to another and to shift a few wards from one district to another in both metropolitan areas" (257 F.Supp. at 980). We find and hold in *Preisler III* that all the 74th General Assembly did in regard to the 1965 Act held constitutionally void in *Preisler II* was to add a few more counties to the shifts of rural counties and to invade more grossly than ever before the population concentrated in the two metropolitan areas of this State.

In *Preisler II* we found that the overvaluation of votes in the particular districts created by the 1965 Act had been established by "the undisputed and unexplained facts" presented in that case. We noted in *Preisler II* that "counsel did not attempt to suggest any reason why it was not practicable to avoid variances

12. The *Hitchcock* case illustrates that in the year 1912, the Supreme Court of Missouri had no difficulty in holding that it was "quite firmly wedded to the doctrine that constitutional requirements must be considered as mandatory, rather than directory" (146 S.W. at 50) and that "courts have jurisdiction to entertain an action, pass on the validity of acts apportioning the state into senatorial districts, and to declare them invalid for infringement upon the Constitution * * *." (146 S.W. at 53). On the merits that case held that giving the city of St. Louis only six senators when a practicable division of the population required seven was a "most flagrant violation of the limited discretion granted by the Constitution to the Legislature" (146 S.W. at 54). Relying upon a Michigan case (Giddings v. Blacker, 93 Mich. 1, 52 N.W. 944, 16 L. R.A. 402), the Supreme Court of Missouri stated that "the time for plain

speaking has arrived in relation to the outrageous practice of gerrymandering, which has become so common, and has so long been indulged in without rebuke that it threatens * * * the permanency of our free institutions * * *. There is not a schoolboy but knows what is the motives of these legislative apportionments; it is idle for the courts to excuse the action upon other grounds, or to keep silent as to the real reason * * *." (146 S.W. at 57).

People who complain today about how federal courts describe the malapportioning action of State legislatures should become more familiar with what state courts had to say on that same subject fifty years ago. Present difficulties arose, of course, because state courts ceased to enforce the express provisions of state constitutions. See Footnote 5, supra.

* * * " (257 F.Supp. at 969). We expressly rejected the argument presented by counsel for the intervenors that the 1965 Act represented "the best that could be gotten under the practical political circumstances" (257 F.Supp. at 969).

We emphasized again and again that the "substantial population deviations and variances" were "unexplained" (257 F.Supp. at 974). We directed attention to what we called the most significant language in *Drum I* in regard to what we believed to be the burden of proof in apportionment cases. We italicized the language of Judge Sobeloff in *Tawes I* from page 976 of 257 F.Supp. that anticipated the Supreme Court's later holding in Kilgarlin v. Hill. On page 977 of 257 F.Supp. of *Preisler II*, we italicized the precise language from *Tawes III* that the Supreme Court quoted as the proper burden of proof rule in Swann v. Adams III. And, finally, we expressly rejected in *Preisler II* defendants' arguments ·that attempted to establish considerations of "political stability" and their arguments concerning "political," "economic," "historical," and "traditional" factors as legitimate grounds upon which disparities from population based districts could be justified (257 F.Supp. at 980).

The legal principles that underlie those findings are, of course, the law of this case as affirmed by the Supreme Court.

## APPENDIX B
### (In Two Parts)

### I. Discussion of House Bill No. 870

Our specific findings in regard to House Bill No. 870 proposed to and rejected by the 1967 Missouri Legislature can best be understood by preliminary examination of the following table:

House Bill No. 870 as Originally Introduced
and Rejected by the 1967 Missouri
General Assembly

| H. B. 870 District No. | 1967 Act District No. | 1960 Census Population | 1960 Population Variance |
|---|---|---|---|
| 1 | (1) | 431,896 [1] | — 85 [1] |
| 2 | (2) | 431,896 [1] | — 85 [1] |
| 3 | (3) | 431,896 [1] | — 85 [1] |
| 4 | (5) | 430,361 | — 1,620 [2] |
| 5 | (6) | 435,066 | + 3,085 [2] |
| 6 | (9) | 431,418 | — 563 |
| 7 | (7) | 427,972 | — 4,009 [2] |
| 8 | (8) | 428,678 | — 3,303 [2] |
| 9 | (9) | 431,897 [1] | — 84 [1] |
| 10 | (10) | 438,733 | + 6,752 [2] |
| | | 4,319,813 | |

1. The total population for Districts 1, 2, 3 and 9 is distributed evenly in this table because St. Louis County Townships were split into precincts and accurate census data for those precincts is not in evidence. However, it is obviously practicable to divide the area involved into almost equal populations because the division involves the shifting of precincts of relatively small populations.

2. The variances produced in the adjoining 4th and 5th Districts and those produced in the adjoining 7th, 8th, and 10th Districts could be further substantially reduced by shifts of townships or precincts from one adjoining district to another. Such shifts are entirely "practicable" under a state policy that seeks to maintain the integrity of a political subdivision line no larger than a precinct. The above

Every district proposed in House Bill No. 870 was more nearly equal to the ideal population than that enacted in the 1967 Act excepting only District 5. Proper application of the constitutional principles of practicability, with use of Kansas City precinct lines as the dividing line, would have permitted the division of the 1,465 excess population for the two congressional districts defined as Districts 5 and 6 in House Bill No. 870 (roughly comparable to Districts 4 and 5 in the 1967 Act) to be divided almost equally between those two proposed districts. Thus, from a theoretical viewpoint, 733 population could have been assigned to one district and 734 to the other. It is therefore apparent that even the −803 variance that accidentally resulted for District 5 in the 1967 Act could have been improved.

Defendants' failure to obtain and to introduce in evidence the 1960 census data for 1967 precincts in St. Louis and St. Louis County does not relieve this Court of its duty of making the finding of fact that the total population assigned Districts 1, 2 and 3 and 9 is only 341 in excess of that required for four ideal congressional districts and that such population could have been practicably divided almost equally among those districts for the reason, as in the case of Kansas City, use of precinct lines for the boundaries of each of those districts, and application of the constitutionally required principle of practicability, would have permitted the shift of precincts from one side of a congressional boundary line to the other until, in the language of the command of Wesberry v. Sanders, "as nearly as is practicable one man's vote in a congressional election [would in fact] be worth as much as another's."

Defendants' and intervenors' expressed hostility to computers and electronic brains is totally misplaced. The task of drawing congressional boundary lines as nearly as is practicable to divide the total population allocated to the four districts proposed by rejected House Bill No. 870, or for all ten districts in Missouri, does not require the use of a computer or an electronic brain. It did and does require one to have and to use accurate population figures, the ability to add and subtract, and, most important, a willingness and desire to comply with the explicit commands of the Constitutions of his State and Nation. Any finding that a better plan could not have been adopted would necessarily be held clearly erroneous because such a finding would be contrary to the undisputed evidence concerning rejected House Bill No. 870.

The witnesses called by defendants testified that "there probably were changes that could be made * * * by the shift of a county here [or there that] would greatly improve this as to the extent of perhaps lowering the difference between the maximum and minimum by as much as 15,000" (Tr. 36); that "there isn't a man in this room that couldn't divide the state on the 1960 population and come up with compact, contiguous districts that come within close equal population" (Tr. 58); and that the 1967 Legislature had in fact rejected "a better bill, a stronger bill" (Tr. 64). Even the three-time Chairman of the Senate Reapportionment Committee testified that "it's mighty easy to * * * divide this state, and either one of us could do it very much better than this [the 1967 Act] is done" (Dep. 14).

And when *Preisler II* was argued, the Assistant Attorney General of Missouri stated to this Court in regard to the 1965 Act that "if you were looking at population as being the sole factor, the only factor that could be considered, * * * I would have to immediately confess * * * that you would probably have to get within one percent variation in order to say that you have met the population factor, if that is your

---

variances are calculated on an assumed policy that county lines are to be recognized in outstate Missouri. There is

some evidence that there is such a policy in Missouri, a matter not necessary for our determination in this case.

sole factor" (first quoted 257 F.Supp. at 968).

It is quite apparent from all the evidence that all real work on the 1967 Act, in exactly the pattern followed in regard to the 1965 Act, was left to the always hectic closing days of the session. The elected leadership of both parties in the Senate and the House were not consulted until long after it was, as a practical matter, too late for them to correct the mistakes of the committees into whose hands control of the delicate problem of reapportionment had been placed. Compare the description of the similar action of the North Dakota legislature in Paulson v. Meier, N.D. 1965, 246 F.Supp. 36 at 42. Attention to that case was directed by the Supreme Court in Swann v. Adams, 385 U.S. 440 at 446, 87 S.Ct. 569, 17 L.Ed.2d 501.

The factual pattern of the 1965 Legislature was repeated in the 1967 session of the Missouri Legislature when Senator Young filed constitutional objections to the 1967 Act in the Senate, on June 28, 1967. His constitutional objection stated that "the congressional districts created * * * do not meet the requirements of the Missouri Constitution that such districts be 'as nearly equal in

population as may be,' Art. III, Section 45." This Court's decision in *Preisler II* was cited and portions of that opinion quoted.

On July 13, 1967 Representatives Meyer (27th), Mulvaney, Schlef and Walsh, filed a constitutional objection in the House. Their objection followed substantially the same form as Senator Young's except that the House objection again reflected the fact that all members of the 74th General Assembly labored under the erroneous impression that the variance between "the high congressional district and the low" was "more than 16,000," instead of 25,802, as was discovered only after defendants' pending motion was filed.

The undisputed facts show that the actual variance between the high district, District 8, *and every other district,* excepting only District 5, actually exceeds the erroneously assumed maximum variance figure of only 16,000 against which the constitutional protests were filed in both the Senate and House. One cannot help but speculate what would have happened had the members of the 74th General Assembly, at the time, been accurately advised in regard to the extent of the variances actually created by their 1967 Act.

II. *Additional Data Showing That the 1967 Act Did Not In Fact Divide Missouri's Population Into Most Practicably Equal Districts*

Map 1 illustrates the point in the text that a Missouri Legislature could have created districts that are more nearly equal in population as is practicable than the 1967 Act and still permit every present incumbent to run from his present residence.

Map 2 illustrates how acceptance of particular districts proposed in various bills presented to the 1967 74th General Assembly, had they been combined, would have produced variances of less than 2,000 population for each district in the State, a more practicable plan than that adopted in the 1967 Act.

Map 3 illustrates more practicably equal districts that would have squeezed all the water out of old District 8 to the end that the urban and rural populations of this State would have been more realistically distributed.

———————

We again emphasize that the publication of these maps is not a recommenda-

tion for the Missouri Legislature to adopt any plan illustrated. The data is stated

to establish the fact that the 1967 Act did not establish districts that were in fact the most nearly equal in population that was practicable.

Map 1

Map 1—Practicable Districts That Would Not Disturb Incumbent Congressional Representatives

| District | Population | Variance |
|---|---|---|
| 1 | 431,735 | — 246 |
| 2 | 431,735 | — 246 |
| 3 | 431,735 | — 246 |
| 4 | 431,386 | — 595 |
| 5 | 431,385 | — 596 |
| 6 | 431,851 | — 130 |
| 7 | 434,250 | +2,269* |
| 8 | 429,688 | —2,293* |
| 9 | 431,735 | — 246 |
| 10 | 434,313 | +2,332** |
| | 4,319,813 | |

* Transfer of particular townships in Dallas or Laclede Counties from 7th District to 8th District would bring both districts within a variation of only 12 population for both districts.

** Transfer of particular townships in either Ste. Genevieve, St. Francois, Iron or Dent Counties from the 10th District to the metropolitan St. Louis Districts (1, 2, 3, or 9) would reduce variation in the 10th District to 724.

Map 2

Map 2—Composite Map from Various Redistricting Plans
Rejected by Missouri General Assembly

| District | Population | Variance | Source |
|---|---|---|---|
| 1 | 431,091 | − 890 | Simple addition |
| 2 | 431,091 | − 890 | " " |
| 3 | 431,091 | − 890 | " " |
| 4 | 432,373 | + 392 | 1967 H.B. 399 minus Cedar & Hickory plus Carroll |
| 5 | 432,373 | + 392 | |
| 6 | 432,249 | + 268 | 1967 Perf. S. C. S. for S.B. 182 |
| 7 | 430,689 | −1,292 | 1967 S.B. 182 (Sen. Sub.) |
| 8 | 433,821 | +1,840 | Simple addition |
| 9 | 431,090 | − 891 | " " |
| 10 | 433,945 | +1,964 | 1965 S.C.S. for S.B. 320 1965 G.A. minus Howell plus Texas |

Map 3

Map 3—Practicable Districts That Would More Realistically
Distribute Urban and Rural Populations

| District | Population | Variance |
|---|---|---|
| 1 | 431,819 | — 162 |
| 2 | 431,819 | — 162 |
| 3 | 431,818 | — 163 |
| 4 | 432,954 | + 973 |
| 5 | 432,955 | + 974 |
| 6 | 433,977 | +1,996 |
| 7 | 433,004 | +1,023 |
| 8 | 429,380 | —2,601 |
| 9 | 431,818 | — 163 |
| 10 | 430,269 | —1,712 |

APPENDIX C

(In Four Parts)

DISCUSSION AND REJECTION OF ADDITIONAL CONTENTIONS MADE BY DEFENDANTS AND INTERVENORS

In addition to the contentions made in support of the 1967 Act that have been answered by what was said in the body of the opinion, we now answer various additional contentions made by the defendants and intervenors.

I. Defendants' "Growth of Population" Argument

Defendants attempt to make the belated contention that "the Fourth and Sixth Districts * * * both * * * contain areas of rapid population growth since 1960 and such population growth was taken into consideration." Apart from the fact that no substantial evidence was introduced upon which such a finding could be based, such a contention is exploded by the following table which illustrates how Missouri's December 31, 1966 population, as estimated by the Missouri Division of Health, is distributed under the 1967 Congressional Districting Act:

Table Showing
Distribution of Missouri Population As
Estimated by Missouri Division of Health
For December 31, 1966 Under 1967 Act

| District | Population [a] | Variation from Dec. 31, 1966 Ideal |
|---|---|---|
| 1 | 481,377 [b] | +30,531 |
| 2 | 481,377 [b] | +30,531 |
| 3 | 481,377 [b] | +30,531 |
| 4 | 433,071 [c] | −16,775 |
| 5 | 433,071 [c] | −16,775 |
| 6 | 442,445 | − 7,401 |
| 7 | 412,140 | −30,305 |
| 8 | 481,377 [b] | +30,531 |
| 9 | 481,377 [b] | +30,531 |
| 10 | 370,844 | −79,002 |
| | 4,498,456 | |

[a] The total estimated population for the State of Missouri on December 31, 1966 is 4,498,456. Thus, the "ideal district" for the projected figures is 449,846 per district.

[b] These figures presume an exactly equal distribution of the projected population within Districts 1, 2, 3, 8 and 9 among those respective districts. Projected population data was not available for the wards and precincts of St. Louis City or for the townships of St. Louis County which are split between Districts 1, 2, 3, 8 and 9.

[c] Projected population distributed exactly between 4th and 5th Districts.

———◆———

The University of Missouri's College of Agriculture, in furtherance of its cooperative extension work authorized by the Acts of May 8 and June 30, 1914, and in cooperation with the United States Department of Agriculture, has published population projections for the years 1967, 1975, and 1990. The population projections of the Missouri Division of Health and those of the University of Missouri reflect some differences in detail. But those differences are not greater than is to be expected. Population projections are necessarily based on

data concerning birth and death rates, past population trends, migration rates, and are usually straight line trend projections that call for the exercise of subjective expert judgment and also depend on the varying dependability of data at a particular time.

A comparison of the two population projections, however, establishes a remarkable general agreement in regard to growth and decline trends of particular geographical areas of Missouri and in regard to where that population is situated in 1967, as compared to where it was situated when the 1960 census was taken.

The following table illustrates where, according to the University of Missouri's projected 1967 and 1975 figures, populations would be distributed under the 1967 Missouri Congressional Reapportionment Acts:

Table Showing

Distribution of Missouri Population
As Projected by University of Missouri
For 1967 and 1975 Under 1967 Act

| | 1967 | | 1975 | |
| District | Projected Population [a] | Variance | Projected Population [a] | Variance |
| 1 | 486,207 [b] | +27,330 | 596,530 [b] | + 62,081 |
| 2 | 486,207 [b] | +27,330 | 596,530 [b] | + 62,081 |
| 3 | 486,207 [b] | +27,330 | 596,530 [b] | + 62,081 |
| 4 | 446,814 [c] | −12,063 | 488,096 [c] | − 46,353 |
| 5 | 446,814 [c] | −12,063 | 488,097 [c] | − 46,352 |
| 6 | 444,444 | −14,433 | 583,480 | + 49,031 |
| 7 | 429,060 | −29,817 | 433,840 | −100,609 |
| 8 | 486,208 [b] | +27,331 | 596,531 [b] | + 62,082 |
| 9 | 486,208 [b] | +27,331 | 596,531 [b] | + 62,082 |
| 10 | 390,599 | −68,278 | 368,329 | −166,120 |
| | 4,588,768 | | 5,344,494 | |

[a] The "ideal districts" for the projected figures are 458,877 and 534,449, respectively, for 1967 and 1975.

[b] See footnote (b) on table on Page 982.

[c] " " (c) " " " " 982.

The shortest answer in regard to defendants' contention about alleged population growth in Districts 4 and 6 is that it is *ex post facto* argument designed as an attempt to justify successive Missouri Legislatures' adamant and continued effort to malapportion in favor of rural geographical areas. There is no evidence whatsoever on which this Court could base a factual finding that the 1967 74th General Assembly adopted any policy of population projection in devising Districts 4 and 6, or any other district, in enacting the 1967 Act. And to adopt such a projection policy for only selected districts, rather than on a state-wide basis, is so irrational that it could not be legally acceptable.

Calkins v. Hare, supra, 228 F.Supp. at 828, we believe correctly observed that "Any districting, however disparate with respect to population, may conceivably be justified by saying the Legislature expected the area to either shrink or to grow." That case correctly stated that "If such a suggestion, without more, suffices to justify gross population disparities, then an easy answer to a constitu-

tional denial has indeed been found." Judge Talbot Smith put his finger on one of the difficulties inherent in the use of any population "trends." He said that "the difficulty in respect to their use is that a basic constitutional right may be lost to a speculative future event, an unequal trade at best and at worst a cynical deprivation." Calkins v. Hare found that "no proofs whatever" were offered that the Michigan legislature had in fact rationally considered any population trend as a justification of the variances created by its congressional districting act. We make the same finding in regard to the 1967 Missouri Legislature.

■ Further reflection since our decision in *Preisler II* on the question of continued use of the 1960 population figures that obviously must favor rural populations over urban in the year 1967 has convinced us that it was the obvious intent of Art. I, § 2 of the Constitution of the United States to tie congressional reapportionment and congressional districting to decennial census required by that same Section (See Appendix D for a full statement of the reasons for our considered view of this question). Article 3, Section 45 of the 1945 Missouri Constitution requires, consistent with the policy established by Art. I, § 2 of the Constitution of the United States, that Missouri draw new congressional districts "of contiguous territory as compact and as nearly equal in population as may be" after each national census. We therefore hold that any Missouri Legislature that attempts to reapportion this State before the 1970 census figures are available may disregard estimates and projections of the 1960 census if it determines so to do.

■ What we have said in connection with defendants' population growth argument in regard to Districts 4 and 6 is equally applicable to their argument that "the eighth district * * * includes Fort Leonard Wood which has a great proportion of transitory population, the University of Missouri with a great number of non-voting students

* * * and Jefferson City which has many state employees who retain a voting residence in other areas of the state [all of which was allegedly] considered by the legislature."

The final and complete answer to all of defendants' attempted *ex post facto* rationalizations is that they have been expressly rejected by the Supreme Court of the United States. Davis v. Mann, 377 U.S. 678 at 691, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609 held:

> We reject appellants' argument that the underrepresentation of Arlington, Fairfax and Norfolk is constitutionally justifiable since it allegedly resulted in part from the fact that those areas contain large numbers of military and military-related personnel. Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible. *Additionally, no showing was made that the Virginia Legislature in fact took such a factor into account in allocating legislative representation.* And state policy, as evidenced by Virginia's election laws, actually favors and fosters voting by military and military-related personnel. (emphasis ours).

The Attorney General of Missouri, in Opinion No. 251, has ruled that "Military personnel at Fort Leonard Wood who are qualified may register and vote in the county where reservation is located, if they have established residence in the state of Missouri, and non-payment of taxes may not disqualify them" (V.A. M.S., Supp. § 111.060, note 10). See also Op.Atty.Gen. No. 93, (V.A.M.S., § 111.060, note 10). Davis v. Mann affirmed the Virginia three-judge court that "put the burden of explanation on defendants, and found that they had failed to meet it" (377 U.S. at 683, 84 S.Ct. at 1444). Actual introduction in evidence of "various exhibits showing the numbers of military and military-related personnel in the City of Norfolk and in Arlington and Fairfax Counties" (377 U.S. at 682, 84 S.Ct. at 1443) was

held to be insufficient evidence in Davis v. Mann to carry the burden of proof.

All that defendants introduced in this case was the hearsay testimony of party leaders whose duty it was to do the best they could with an apportionment act that had, in fact, to borrow Judge William E. Doyle's language, been "designed and dictated * * * by political expediency" (from Lisco v. Love, D.C.Colo. 1963, 219 F.Supp. 922 at 942). Any finding that the 1967 Missouri Legislature in fact took the actual military, student, or state employee population into account in drawing District 8 or any other district in its 1967 Act would obviously be set aside as clearly erroneous. How could the 1967 Missouri Legislature have considered that particular segment of Missouri population when it did not even actually know the total population of Missouri? Further discussion is redundant.

## II. Defendants' Contention That The Art. I, § 2 Standard of "As Nearly Equal As Is Practicable" Is Not A Precise Constitutional Standard

Historically speaking, the legislative branches of both the State and federal governments participated in a long period of bold and blatant disregard of Art. I, § 2 of the Constitution unrestrained by traditional judicial review of alleged constitutional infringement. That fact has tended to obscure the further fact that the constitutional standard of Art. I, § 2 expressed by the words "as nearly as is practicable," is a standard well established in law and was not one but recently introduced into the political language of our country by the Supreme Court of the United States in Wesberry v. Sanders.

Many persons, including infrequently a judge, erroneously attempt to convince themselves that when Wesberry v. Sanders used the truly ancient language of "as nearly as is practicable," the Supreme Court was somehow talking about something attainable as a matter of practical politics. The uninformed ignore not only the difference between the meaning of the words "practicable" and "prac-

tical", but much of the history and hard experience of this Nation. A recent, but promptly reversed, rare judicial example of such thinking was the majority opinion's statement in Lucas v. Rhodes, N. D. Ohio, decided May 12, 1967 but not yet reported, that "an element of 'practicality' is implicit in the concept of 'practicability' as that term is to be applied in a districting case." The Supreme Court reversed December 5, 1967 in a single sentence per curiam opinion. See 389 U.S. 212, 88 S.Ct. 416, 19 L.Ed.2d 423.

In *Preisler II* we did not deem it necessary to do more than to call attention to the language of Mr. Justice Black's dissent in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, where he used the words "so far as feasible" synonymously with "as nearly as is practicable" language of Wesberry v. Sanders. On page 973 of 257 F.Supp. of *Preisler II*, we stated:

> Use of such words as "feasible" and "practicable" in a careful statement of the fundamental constitutional principle constitutes but a recognition that the familiar doctrine of *de minimis* is applicable and is designed to make clear that a State legislature would not be expected to create entirely new political subdivision lines in order to have absolute and precise mathematical equality in its congressional districts.

Defendants' insistence that "as near as practicable" has something to do with what a group of political leaders choose to call a "reasonable and practical political compromise," together with certain language in some of the apportionment cases, suggests that we add to what was said in *Preisler II*.

Should a court accept the sophistic argument that the words "as nearly as is practicable" are not words of precise and historic meaning, it is but a short step to saying that those words have little meaning at all. Should that step be taken it is apparent that a rationale could be developed under which the decision of a particular apportionment case would turn, not on the question of whether a

particular apportionment plan does in fact contain congressional districts "as nearly equal [in population] as is practicable," but upon the subjective and generalized judgment of whether, as a matter of practical politics, a particular state legislature could or could not have come closer to complying with the constitutional command of Art. I, § 2. In *Preisler II* we finally rejected "the idea that an apportionment plan can be 'slightly unconstitutional'." That determination is the law of this case.

The rationale of the two judge majority in the recent Ohio three-judge case is an example of what we believe to be an invitation to follow a primrose path through the thicket that courts, both State and federal, are now required to enter. That opinion, before the Supreme Court's most recent reversal, attempted to say that the Supreme Court's use of the "as nearly as is practicable" standard in Wesberry v. Sanders "established no precise definition of 'practicability'" (xiii). Having made that erroneous assumption, unsupported by any Supreme Court decision, the two Ohio federal judges felt free to add that "all the law and the courts expect [is] the best obtainable result; the most practical result, will * * have to suffice" (xvii). Without any support in any decision of the Supreme Court, those two judges attempted to avoid application of the constitutional standard of "as nearly as is practicable" to the facts established in the Ohio case by erroneously assuming that "an element of 'practicality' is implicit in the concept of 'practicability' as that term is to be applied in a districting case" (xxiii). We believe that the Supreme Court's reversal of the Ohio case must be read as an implicit rejection of the rationale upon which the lower court based its approval of the Ohio congressional districting plan for reasons we shall state.

The introduction and long time use of the words "as nearly as practicable" as a term of art and as a part of the language of congressional apportionment is much older than the Apportionment Act of February 2, 1872 (17 Stat. 28 (1872));

the first act of Congress to use those words. Congress, of course, continued to use those exact words in each of its successive apportionment acts up to and including the Act of August 8, 1911, 37 Stat. 14, which appeared as Section 3 of Title 2, United States Code, still printed in U.S.C.A. (For the long history of congressional use of "as nearly as practicable," see Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1923)).

And when President Truman tried to get the Eighty-second Congress to do something about congressional failure to deal with congressional malapportionment he used the same well-understood language when he recommended that Congress pass a bill that would have provided that districts "be composed of contiguous and compact territory and contain as nearly as practicable, the same number of individuals." See Message from the President of the United States H.R. Dec. 36 82d Cong. 1st Sess. (Jan. 9, 1951).

A review of much earlier Congressional apportionment history reveals the circumstances under which the words "as nearly as practicable" acquired their precise and established meaning. Interestingly enough, reference to that early history is to be found in decisions written by the Supreme Court of Missouri.

Missouri has traditionally been one of many states that made valiant attempts not to leave apportionment problems, to use Congressman Celler's words, "to the whims and uncontrolled discretion of the legislature" (see footnote 10 above). Section 6 of Article 4 of the 1875 Missouri Constitution required, for example, that the state senatorial districts be elected from "districts of compact and contiguous territory, and of population *as nearly equal as may be.*" State ex rel. Barrett v. Hitchcock, supra, illustrates the reason why a Missouri court fifty years ago had no difficulty with the "as nearly equal as may be" language in the 1875 Missouri Constitution. That court was familiar with where and under what circumstances those words had been incorporated into the language of apportionment. The Missouri Supreme Court in 1912

adopted the following language from the still earlier case of Parker v. State, 133 Ind. 178, 32 N.E. 836, 18 L.R.A. 567, which noted that "A question somewhat similar to the one now under discussion arose in the Congress of the United States in the year 1832, relative to the construction to be placed upon section 2, art. 1, of the Constitution of the United States" (page 64 of 146 S.W.)

It then noted that the question had been referred to a committee on which Daniel Webster served as chairman. The Indiana court, writing in 1892, quite correctly stated what Congress finally did in 1872 when it wrote the "as nearly as practicable" standard into the federal code. It stated:

> The rule recommended by this committee was subsequently adopted by Congress, so that Representatives are now apportioned among the several states of the Union under it as a fixed and binding obligation. (supra, at p. 65).

We make a more detailed examination of the 1832 report made by Daniel Webster because the words "as nearly as practicable" acquired their well established meaning from what Daniel Webster said in his specific discussion of Art. I, § 2 of the Constitution which he spent a lifetime defending.

In the year 1832 Daniel Webster said the following in regard to the language of Art. I, § 2:

> There would seem to be little difficulty in understanding these provisions. The terms used are designed, doubtless to be received in no peculiar or technical sense, but according to their common and popular acceptation. To *apportion*, is to distribute by right measure; to set off in just parts; to assign in due and proper proportion * * *. Representation founded on members, must have some limit, and being, from its nature, a thing not capable of indefinite subdivision, it cannot be made precisely equal * *. It is quite obvious therefore, that the apportionment of representative power can never be precise and perfect.

There must always exist some degree of inequality. [Senate Report, 22d Congress, 1st. Sess., Doc. No. 119 (1832)] p. 4 (Emphasis in original).

The obvious problem, recognized both by Webster and by every court that has since looked at Art. I, § 2 was not difficult to solve if one wished to apply principle, as distinguished from whim. Webster recognized, as did Wesberry v. Sanders, that:

> The constitution, therefore, must be understood not as enjoining an absolute relative equality—because that would be demanding an impossibility—but as requiring of Congress to make the apportionment of representatives among the several States, according to their respective numbers, *as near as may be.* That which cannot be done perfectly, must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the greatest practicable approach to exactness ought to be made (id. p. 4) (Emphasis in original).

Webster made clear that the Congress was bound by Art. I, § 2 of the Constitution because "Congress is not absolved from all rule, merely because the rule of perfect justice cannot be applied." In typical language Webster added:

> In such a case, approximation becomes a rule; it takes the place of that other rule which would be preferable, but which is found inapplicable, and becomes, itself, an obligation of binding force. The nearest approximation to exact truth or exact right, when that exact truth, or that exact right cannot itself be reached, prevails in other cases, not as matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind; a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule or obligation.

> The committee understands the constitution as they would have understood it, if it had said, in so many words, that representatives should be

apportioned among the States according to their respective members, *as near as may be.* If this be not its true meaning, then it has either given, on this most delicate and important subject, a rule which is always impracticable, or else it has given no rule at all; because, if the rule be that representatives should be apportioned *exactly* according to numbers, it is impracticable in every case; and if, for this reason that cannot be the rule, then there is no rule whatever, unless the rule be that they shall be apportioned *as near as may be.*

This construction, indeed, which the committee adopt, has not, to their knowledge, been denied; and they proceed in the discussion of the question before the Senate, taking for granted that such is the true and undeniable meaning of the constitution. (Italics Daniel Webster's). (p. 5).

As to where the burden lay in regard to sustaining an apportionment, Webster anticipated Swann v. Adams III by one hundred and thirty-five years. Webster said in 1832 that:

Without disturbing the proposed number of the House, the mere changing of these three members from and to the six States respectively, would bring the representation of each of the whole six, nearer to their due proportion, according to their respective numbers, than the bill, in its present form, makes it. In the face of this indisputable truth, how can it be said that the bill apportions these members among those States according to their respective numbers, *as near as may be?*

The principle on which the proposed amendment is founded * * * is little other than a transcript of the words of the constitution, and its results are mathematically certain. The constitution, as the committee understand it, says, representatives shall be apportioned among the States according to their respective numbers of people, *as near as may be.* The rule adopted by the committee, says, out of the whole

number of the House, that number shall be apportioned to each State which comes nearest to its exact right according to its number of people. * * What the constitution requires, is the nearest practicable approach to precise justice. The rule is approximation; and we ought to approach, therefore, on which ever side we can approach nearest. (Emphasis Daniel Webster's) (p. 7).

Courts that have been forced to answer present day arguments which have been based upon the erroneous idea that the "as nearly as is practicable" language of Wesberry v. Sanders is somehow vague or imprecise have had no more difficulty with that argument than the Indiana court had over fifty years ago. In Jones v. Falcey, 48 N.J. 25, 222 A.2d 101 (1966), for example, the Attorney General of New Jersey argued that "as nearly as is practicable" could be taken to mean that which is represented to be the best political compromise within the ambit of what is called practical legislative politics. Chief Justice Weintraub, of the Supreme Court of New Jersey, correctly stated that "The Constitution, as construed in *Wesberry* and *Reynolds*, does not contemplate that there is a range of deviation within which a State may maneuver, with or without reason." In regard to the "as nearly as practicable" language of Wesberry v. Sanders, it was stated:

The command is to achieve population equality "as nearly as practicable" and if equality would be more nearly achieved by shifting whole municipalities to a contiguous district, the draftsman has not achieved equality "as nearly as practicable," unless some other constitutionally tenable reason (if there is any) can be shown to justify the disparity. If the lines of political subdivisions are ignored, there is no apparent reason for not achieving mathematical equality, subject of course to inevitable *de minimis* variations. (222 A.2d 107–108).

In Swann v. Adams III the defendants contended, as do defendants in this case,

that the Florida "plan comes as close as *'practical'* to complete population equality" (385 U.S. at 445, 87 S.Ct. at 573) (emphasis ours). The Supreme Court rather curtly answered the argument that "practicable" may be taken to mean "practical" by holding that "it seems quite obvious that the State could have come much closer to providing districts of equal population than it did" (385 U.S. at 445, 87 S.Ct. at 573). After noting that the plaintiffs had "placed before the court their own plan which revealed much smaller variations between the districts" and that "appellants suggested to the District Court specific amendments to the legislative plan, which, if they had been accepted, would have measurably reduced the population differences between many of the districts," the Supreme Court held that such facts "demonstrate that a closer approximation to equally populated districts was *a feasible undertaking*" (385 U.S. at 445–446, 87 S.Ct. at 573.) (emphasis added).

It is apparent that even in state apportionment cases, where admittedly there is more permissible play at the joints than in congressional districting, the rule is one of "practicability" rather than political "practicality." The principle applicable to all apportionment cases, regardless of whether they involve State or congressional districting, is whether it was practicable or, to use the synonymous word "feasible" for the apportioning body to "have come much closer to providing equal districts of equal population than it did" and whether "specific amendments * * * which, if * * * accepted, would have measurably reduced the population differences between many of the districts" (385 U.S. at 445, 87 S.Ct. at 573).

Such facts, if established in a particular case, the Supreme Court has held "demonstrate that a closer approximation to equally populated districts was a feasible undertaking" (385 U.S. at 445–446, 87 S.Ct. at 573). This means, of course, that the apportionment plan must be held unconstitutional unless a particular State carries the burden of showing that the obvious variances were either unavoidable or justified on some legally acceptable ground.

Until prohibited in 1932 by Wood v. Broom, supra, from exercising jurisdiction to enforce the then sixty year old Congressional requirement that congressional districts be compact, contiguous and contain "as nearly as practicable" an equal number of inhabitants, the federal courts had no difficulty whatsoever in either understanding that language or in applying the standard it established to the facts presented by particular cases.

In Broom v. Wood, S.D.Miss.1932, 1 F.Supp 134, for example, a lower three-judge court held that the Mississippi legislature had not complied with the congressional command that had been on the books since 1872. That court held that the congressional "act is mandatory and must be followed by the states in fixing congressional districts" (1 F.Supp. at 135).

It held that Mississippi variances there involved were "clearly violative of the * * * act of Congress and illegal and void." (Ibid).

In Hume v. Mahan, E.D.Ken.1932, 1 F. Supp. 142, a federal court in Kentucky ruled the 1932 Kentucky congressional apportionment to be in violation of the "as nearly as practicable" standard established by the Congress. That court concluded that the Kentucky Congressional districting act "was framed in deliberate disregard of the federal statute" (1 F.Supp. at 149). After setting out the factual situation concerning the population of the counties of Kentucky, that court held that: "In view of this situation, the Legislature was confronted with no difficulty whatever in dividing these one hundred and nineteen counties into eight congressional districts of substantially equal population, and this without the necessity of dividing any county; and the topography of the state presents no obstacle to carving these districts out of contiguous and compact territory" (id. at p. 150)

In anticipation of the rule of decision now settled by Swann v. Adams III and Kilgarlin v. Hill, that court stated thirty years ago that:

> As an example of the ease with which these one hundred and nineteen counties can be erected into eight congressional districts, composed of contiguous and compact territory and with substantially equal population, the court during the argument called upon counsel for the plaintiff to file a map showing if and how this could be done. Such map was prepared and filed as an exhibit in the case. This map shows that these counties could have been laid off into eight congressional districts with no greater difference in population between them than approximately 4,000 people, and this without doing violence to the requirement that the districts must be composed of compact and contiguous territory. (Id. at p. 150).

That court made clear that "no real difficulty confronted the Legislature in substantially complying with the federal law." That court added that "Instead of doing so, however, the Legislature, without any reason whatever so far as I can discover other than the exigencies of practical politics, in redistricting the state worked out a gross inequality in population between the respective districts." After further analysis of the actual distribution of population of Kentucky, the court held, again anticipating current apportionment rules of decision by thirty-five years, that:

> In view of the ease with which these discriminations could have been avoided, we are forced to the conclusion that no attempt was made to avoid them, but that other considerations than the securing of equality of population dictated the laying out of these districts. (Ibid)

This case was, of course, reversed on the authority of Wood v. Brown, supra. See Mahan, Secretary v. Hume, 287 U.S. 575, 53 S.Ct. 223, 77 L.Ed. 505. But such reversal was based solely on the ground that the Congress, after having failed to enact any reapportionment act following the 1920 census, had also intentionally failed to include the 1872 standard of "as nearly as practicable" in its bill to be applicable to the reapportionment under the 1930 census. The two federal cases just cited were, of course, decided on the theory that the "as nearly as practicable" standard was still in effect as a congressional command under the Act of August 8, 1911. What those courts said in regard to how that standard should be applied is as good law today as it was when written over thirty years ago. The fact that Wesberry v. Sanders made the "as nearly as practicable" a constitutional standard does not afect the validity of the rationale applied by those cases.

■ The standard of "as nearly as practicable" means today what it meant to Daniel Webster and has meant throughout our history. Within the context of congressional districting, if plans before the legislature or in evidence before a court establish that more equal districting was obtainable than that which was adopted, then obviously the plan enacted, on the facts, does not meet the now constitutional command that the districting be equal "as nearly as is practicable."

It should be apparent that efforts to substitute considerations of "practical politics" and ideas of "best legislative compromise" for the historic meaning of the now constitutional command of "as nearly as practicable" were foreclosed by the Great Compromise, as embodied in Article I, § 2, and as interpreted by Wesberry v. Sanders. It should also be apparent to all who want to understand that the legislative bodies of this Nation no longer have a license to violate the plain and explicit commands of the Constitution of the United States, that those who make the laws are required to follow the Constitution in the same manner as all other persons, and that all failures to do so are subject to the same traditional judicial remedies that our continuing experiment has evolved from the time of John Marshall.

III. Defendants' "Comparative Table" Argument

 Defendants set forth on pages 19 and 20 of their brief a table on which the various States have been ranked according to what defendants have labeled "Total % of Deviation" column.[13] Missouri is ranked eighth on that table. Defendants argue that "an examination of the table dramatically demonstrates that the Missouri Congressional Districts all fall well within *de minimis* variations."

In Davis v. Mann, supra, the defendants introduced in evidence (as distinguished from simply putting unsupported and inaccurate data in their brief) the "results of a comparative study of state legislative apportionments which show Virginia ranking eighth among the States in population-based legislative representativeness" (377 U.S. at 682, 84 S.Ct. at 1443). The Supreme Court rejected defendants' attempted justification based on that sort of comparative data. Swann v. Adams III is even more explicit in its holding that "the fact that a * * * variation from the norm is approved in

one State has little bearing on the validity of a similar variation in another State" (385 U.S. at 445, 87 S.Ct. at 572). See also Reynolds v. Sims, 377 U.S. 533 at 578, 84 S.Ct. 1362 at 1390, holding: "What is marginally permissible in one State may be unsatisfactory in another, depending upon the particular circumstances of the case."

Those three Supreme Court cases dispose of defendants' comparative table argument. Tabulations of the sort defendants have presented to this Court in all three of the *Preisler* cases reflect an exceedingly short chapter of the long history of malapportionment in the United States. A more complete history of congressional reapportionment establishes that whatever present rank may be assigned a particular State, such ranking has not been attained without recent judicial encouragement, and, in some instances, actual court order.

A more meaningful history is obtained when the data set forth in Appendix I attached to the opinion of Mr. Justice Frankfurter in Colegrove v. Green, 328

---

13. Defendants' table is purportedly based on data published in the Congressional Quarterly Weekly Report for September 16, 1966, and August, 1967 issue of the National Municipal League, and U.S. Senate Report No. 219, 90th Cong. 1st Sess., June 1, 1967, together with letters from the Attorney Generals of various states.

No such data comparable to defendants' "Total % of Deviation" column appears in any of those sources. The Congressional Quarterly Weekly Report for September 16, 1966, on page 814, does contain a table purporting to set forth "% Maximum Variations" from the various states. None of the figures on that table agree with any of the figures on defendants' table. We have not been favored with copies of the letters received from the various Attorney Generals.

The particular percentage figures used on defendants' table, in any event, are necessarily inaccurate. An examination of other percentage figures on the Table shows that defendants merely added together the percentages by which the largest and the smallest districts of a particular State purportedly deviated from the ideal district for that State. The sum of those percentages does not

reflect the accurate percentage of deviation between the largest and smallest districts; the simple addition of those figures will always produce a smaller percentage figure than that produced by accurate mathematical calculation.

The "Total % of Deviation" column on Defendants' Table is therefore smaller than what are the actual percentage deviations between the highest and lowest districts accurately calculated in accordance with proper mathematical principle. This fact of mathematical life is illustrated by an examination of the Table introduced in the House of Representatives last April 25, 1967 by Representative Conyers of Michigan as it appears in the Congressional Record, 90th Cong. 1st Sess. page H4620. That table sets forth three columns: (1) % deviation between highest and lowest; (2) % deviation between largest and ideal; and (3) % deviation between smallest and ideal. The maximum deviation between the largest and smallest is always a larger percentage figure than the total of the two other columns. Defendants' Table, as we have noted, attempts to play another form of the numbers game in order to make larger figures look smaller on their table.

U.S. at 557, 66 S.Ct. 1198, and that set forth in the Appendix attached to Mr. Justice Harlan's dissent in Wesberry v. Sanders, 376 U.S. at page 49, 84 S.Ct. 526, is cumulated in a single table. We present data for a limited number of the "better" States; the history of every State in the country presents a picture different only in degree from her sister States.

The following table performs that function:

Congressional Malapportionment Showing
Pre-Wesberry v. Sanders (1964) Maximum Variances
Between Largest and Smallest Districts of
States Ranked on Defendants' 1967 Chart

Additional Data Compiled from Appendix I attached to Mr. Justice Frankfurter's dissenting opinion in Colegrove v. Green, 328 U.S. 549, at 557–559, 66 S.Ct. 1198, 90 L.Ed. 1432, and Appendix to Mr. Justice Harlan's dissenting opinion in Wesberry v. Sanders, 376 U.S. 1, at 49–50, 84 S.Ct. 526, 11 L.Ed.2d 481.

| State | 1897 | 1928 | 1946 | 1960 | 1967 |
|---|---|---|---|---|---|
| Florida | 202,792 | 315,292 | 439,895 | 660,345 | 415,704 |
| | 188,630 | 187,474 | 186,831 | 237,235 | 407,677 |
| | 14,162 | 127,818 | 253,064 | 423,110 | 8,027 |
| Arkansas | 220,261 | 330,292 | 423,152 | 575,385 | 453,567 |
| | 147,806 | 180,348 | 177,476 | 332,844 | 443,892 |
| | 72,455 | 149,944 | 245,676 | 242,541 | 9,675 |
| Maryland | 208,165 | 311,413 | 534,568 | 711,045 | 393,210 |
| | 153,912 | 194,568 | 195,427 | 243,570 | 383,237 |
| | 54,253 | 116,845 | 339,141 | 467,475 | 9,973 |
| Utah | 1 Rep. (At Large) | 229,907 | 293,922 | 572,654 | 451,864 |
| | | 219,489 | 256,388 | 317,973 | 438,763 |
| | | 10,418 | 37,534 | 254,681 | 13,101 |
| Michigan | 191,841 | 533,748 | 419,007 | 802,994 | 417,026 |
| | 148,626 | 198,679 | 200,265 | 177,431 | 403,263 |
| | 43,215 | 335,069 | 218,742 | 625,563 | 13,763 |
| Oklahoma | Not yet Admitted | 325,680 | 416,863 | 552,863 | 396,161 |
| | | 189,472 | 189,547 | 227,692 | 380,734 |
| | | 136,208 | 227,316 | 325,171 | 15,427 |
| Tennessee | 199,972 | 296,396 | 388,938 | 627,019 | 404,968 |
| | 153,773 | 145,403 | 225,918 | 223,387 | 388,240 |
| | 46,199 | 150,993 | 163,020 | 403,632 | 16,728 |
| North Carolina | 204,686 | 408,139 | 358,573 | 491,461 | 423,750 |
| | 160,288 | 202,760 | 239,040 | 277,861 | 406,474 |
| | 44,398 | 205,379 | 119,533 | 213,600 | 17,276 |
| Montana | 1 Rep. (At Large) | 333,476 | 323,597 | 400,573 | 347,701 |
| | | 215,413 | 235,859 | 274,194 | 327,019 |
| | | 118,063 | 87,738 | 126,379 | 20,682 |

The cumulated data reflects the historic pattern of congressional malapportionment before 1964 (when Wesberry v. Sanders was decided) and the dramatic impact of that decision. William J. D. Boyd, editor of the National Civic Review, writing in the April, 1966 issue of that publication, accurately summarized the post-Wesberry v. Sanders congressional apportionment history when he stated that: "Comparatively little fanfare has accompanied the wholesale

change in congressional districts that has taken place since February, 1964, when the United States Supreme Court ordered that they be substantially equal in population." He reported that within the first two years after Wesberry v. Sanders that 25 States had completed their redistricting, adding that "Although the redistricting process has caused several disputes, the pace of congressional change has been more rapid and less controversial than state legislative reapportionment; therefore the Press has taken far less notice of the changes taking place."

The most recent statement of post-Wesberry v. Sanders progress was that made by Senator Howard Baker of Tennessee to the United States Senate on November 8, 1967. (Cong. Rec. 90th Cong., 1st Sess., S 16111). He there stated that "since the *Wesberry* decision, district lines have been reshaped in 33 States." He added that "many States redistricted voluntarily; some only with the encouragement of a court's order; and, in a few States where the legislatures could not agree, the courts themselves redrew the lines."

The bare bones statement of why and how the States on the above table came to redistrict after Wesberry v. Sanders was decided, is as follows:

| State | Action Taken Subsequent to Wesberry v. Sanders |
| --- | --- |
| Florida | Court ordered plan in Gong v. Kirk, supra, after repeated legislative failures |
| Arkansas | Legislature adopted present plan following Park v. Faubus, E.D.Ark., 1965, 238 F.Supp. 62. |
| Maryland | Court ordered plan in Maryland Citizens Comm. for Fair Cong. Red. v. Tawes, supra, after repeated legislative failures |
| Utah | Voluntary legislative action subsequent to Wesberry v. Sanders; no additional court action was necessary. |
| Michigan | Legislature adopted present plan following Calkins v. Hare, E.D.Mich., 1964, 228 F.Supp. 824. |
| Oklahoma | Voluntary legislative action subsequent to Wesberry v. Sanders; no additional court action was necessary. |
| Tennessee | Court ordered plan in Baker v. Ellington, supra, after repeated legislative failures. |
| North Carolina | Legislature adopted present plan after two earlier failures; held to be not unconstitutional in Drum v. Seawell, supra. |
| Montana | Legislature adopted present plan following Roberts v. Babcock, D.Mont., 1965, 246 F.Supp. 396 |

———◆———

Consistent with Davis v. Mann's determination that the fact that a study showed "Virginia as ranking eighth among the States" was immaterial, we reject defendants' *Preisler III* argument that Missouri "ranks eighth among the States" as being totally irrelevant to the question of whether the 1967 Missouri Act has in fact and in law divided the State of Missouri into congressional districts as nearly equal in population as is practicable in accordance with the com-

mand of both the Missouri and United States Constitutions.

Defendants also argue that their table shows that, "by comparison, the recent efforts of the Missouri Legislature in congressional redistricting are truly commendable." Apart from the fact that comparison is not a proper criterion under the Supreme Court cases, the hard facts concerning Missouri's reapportionment efforts cannot fairly be said to be "truly commendable." The history of congressional reapportionment in Missouri, like that of all her Sister states, shows that progress has been made. But it is one thing to say that progress has been made; it is quite another thing to say that progress can be described as commendable, unless, of course, that progress has been sufficient to comply with the Constitution.

The facts in regard to Missouri's progress establish that in 1928, shortly before Missouri's most recent congressional election at large, the variation between its highest district (pop. 521,-587) and its lowest (pop. 138,807) was 382,708. The converse of the fear expressed by Missouri Congressman Bowlin in 1844 that "One vote in St. Louis [would be made] equal to four or five in the country" had in fact come to pass; the ratio, however, was nearly the same.

From 1928 to 1932, when representatives were being elected from those malapportioned districts, a majority of Missouri's population for the first time in her history, began to live in urban areas. But throughout all that time only three of Missouri's representatives were elected from St. Louis and one from Kansas City; with the remaining 12 of the then 16 member delegation from outstate Missouri.

Forced to reapportion by a loss in representation under the 1960 census, Missouri cut the variation between its highest and lowest district to 128,355 by its 1961 Act. That Act was held constitutionally void in *Preisler I*. Following that decision, Missouri, by its 1965 Act, cut the variance between the highest and the lowest districts to 84,655. The 1965 Act was held constitutionally void in *Preisler II*. The 1967 Act, which we today hold to be unconstitutional, only cut the variance between the highest and lowest district to 25,792. We fail to understand how comparison with the infinitely better job an increasingly large number of other States have done to protect the constitutional rights of their citizens can be said to support an argument that Missouri's progress should be called "truly commendable." The progress of no State, including Missouri, can fairly be said to be commendable until and unless such a State fully and fairly complies with the command of both State and federal constitutional law.

Missouri's progress cannot fairly be described as commendable when viewed in light of the fact that the legislatures of both Utah and adjoining Oklahoma voluntarily complied with Wesberry v. Sanders without the necessity of any further court action. Those States enacted what are apparently substantially better plans than those which Missouri has been able to enact after three abortive attempts. The legislatures of Michigan, Montana, and adjoining Arkansas needed to be told only once by a federal three-judge court for the legislatures of those three States to do an apparently better job than Missouri has been able to do in three separate attempts.

Indeed, the unvarnished truth is that Missouri is one of only four of the fifty States in the Union that has had to be told more than twice that the Constitution of the United States must and will be enforced as the Supreme Law of the Land in order that the people of the United States who reside in Missouri have government by law rather than by men.

It is quite apparent that a broader review of Missouri's progress in congressional apportionment presents quite a different picture of the quality of the efforts by recent Missouri legislatures. We cannot find that those efforts are commendable because we cannot find that Missouri has yet complied with the command of Art. I, § 2 of the Constitution.

## IV. Defendants' Attempted Reliance On Recent Mississippi Case Not Tenable

As a facet of their untenable comparative table argument, defendants direct particular attention to the decision of the Mississippi three-judge court in Connor v. Johnson, S.D.Miss. No.3830, 265 F.Supp. 492, decided September 30, 1966, affirmed by the Supreme Court per curiam, 386 U.S. 483, 87 S.Ct. 1174, 18 L.Ed. 2d 224 (1967).

Defendants insist that the Supreme Court's affirmance of that case in fact approved the variances contained in the 1966 Mississippi congressional plan, and therefore contend that "the constitutionality of the 1967 Missouri Redistricting Act is amply demonstrated by this Mississippi decision." [14] We do not agree.

Considerations implicit in Rule 15, subd. 1(c) of the Supreme Court of the United States and the principle of appellate review repeatedly announced and specifically applied by the Supreme Court in apportionment cases, prohibits this Court from holding that the Supreme Court in any way intended, by affirmance of Connor v. Johnson, to approve the variances contained in the 1966 Mississippi plan or to overrule what it had so recently stated in Swann v. Adams III and Kilgarlin v. Hill.

Rule 15, subd. 1(c) of the Rules of the Supreme Court of the United States requires that the "questions presented" by an appellant be separately set forth in appellant's Jurisdictional Statement and that while "the statement of a question presented will be deemed to include every subsidiary question fairly comprised therein," appellants are put on notice that "only the questions set forth in the jurisdictional statement or fairly comprised therein will be considered" and that "the jurisdictional statement may not raise additional questions or change the substance of the questions already presented."

Wesberry v. Sanders, supra, in order to foreclose any possible future claim of confusion, expressly stated that the decision in that case was limited to the question presented under Art. I, § 2. The Supreme Court stated: "We do not reach the arguments that the Georgia statute violates the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment" (376 U.S. at 8, footnote 10, 84 S.Ct. at 530).

The fact that a Fourteenth Amendment apportionment challenge can not be said to be included *ipso facto* in a case which presents only an Art. I, § 2 inequality of population question was underlined the very day Wesberry v. Sanders was decided. In Wright v. Rockefeller, 376 U.S. 52 at 58, 84 S.Ct. 603, 11 L.Ed.2d 512 at 606 the Supreme Court

---

14. Intervenors argue in a similar vein that the "Supreme Court's affirmance of an apportionment in Mississippi which is less nearly perfect than ours compels the conclusion that our 1967 Act is within acceptable constitutional limits" and that "under these circumstances it would be an abuse of judicial power to strike down the hard product of the legislative process." We refrain from commenting on intervenors' claim of the 1967 Act as "our 1967 Act" other than to state that, so far as the record in this case shows, we are required to consider the 1967 Act as the act of the 74th General Assembly of Missouri; not that of the intervenors. We feel compelled to state further that it is our view that the right of any proper party to a direct appeal to the Supreme Court of the United States is ample protection against any alleged abuse of judicial power conferred on this Court by the Constitution and laws of the United States. In *Preisler II* we welcomed an appeal in order that the obvious question of conflict between the rationale of *Preisler II* and that of Martin v. Bush II, D.C., 251 F.Supp. 484, would be squarely presented, to the Supreme Court for its final resolution (257 F.Supp. at 979, footnote 17). We feel the same way about an appeal in *Preisler III* even though no present conflict with any other court is presented. All courts, both State and Federal, have followed and properly applied Swann v. Adams III and Kilgarlin v. Hill except that the two-judge majority opinion in Rhodes v. Lucas, supra. That potential conflict was eliminated by the recent Supreme Court reversal of *Rhodes*.

emphasized "We do not pass on the question which appellants have not presented here, that is, whether the state apportionment [the New York Congressional District Act] is constitutionally invalid because it may fail in its objective to create districts based as nearly as practicable on equal population." Specific attention was there directed to Wesberry v. Sanders, in which an inequality of population question under Art. I, § 2 was presented and decided the same day.

Wright v. Rockefeller made it clear that the Supreme Court's affirmance of a lower three-judge court's rejection of a Fourteenth Amendment challenge may not, under any circumstances, be considered by a future lower court as an approval of population variances that may appear in the challenged congressional apportionment. The Supreme Court stated that its holding on a Fourteenth Amendment question "has no bearing on [the] wholly separate question" that would be presented by an Art. I, § 2 challenge because "no such challenge has been urged here, the issues have not been formulated to bring it into focus, and the evidence has not been offered or appraised to decide it." [15] The same principle governing the scope of the Supreme Court review was stated and applied in Lucas v. Colorado Gen. Assembly, 377 U.S. 713 (1964), at 726, 730, 84 S.Ct. 1459, 12 L.Ed.2d 632, and Fortson v. Dorsey, 379 U.S. 433 (1965) at 439, 85 S.Ct. 498, 13 L.Ed.2d 401.

In order that there could be no doubt about what questions were in fact presented to both the Mississippi three-judge court and to the Supreme Court of the United States we requested copies of and we have carefully reviewed the Jurisdictional Statement filed by Appellants and Appellees' Motion to Dismiss or Affirm filed in the Supreme Court.

The questions presented to the District Court for the Southern District of Mississippi were detailed in its opinion. The six contentions of the plaintiffs as set forth on page 32, contain no mention whatever of Art. I, § 2 nor do they make any reference to any alleged abridgment of the denial of the one-man, one-vote principle. Every contention there stated involved a Fourteenth Amendment challenge of racial gerrymander or discrimination.

The "Question Presented" to the United States Supreme Court as set forth on page 2 of Appellant's Jurisdictional Statement was whether the 1966 Mississippi congressional districting plan violated "the Fourteenth and Fifteenth Amendments to the U.S. Constitution."

Appellees appropriately responded to appellants' statement of the question presented on page 3 of their supporting brief by stating that: "Art. I, Sec. 2 of the U.S. Constitution * * * was not invoked in the lower court and has not been sought to be invoked here."

Our examination of the pleadings and briefs filed in the Supreme Court in the appeal of Connor v. Johnson establishes that, as in Wright v. Rockefeller, no Art. I, § 2 inequality of population question was presented to the Supreme Court in connection with the recent Mississippi case; that the issues concerning that wholly separate question were not formulated to bring such a challenge in focus; and that no evidence was offered or appraised by the lower court to decide

15. The "wholly separate question" of whether New York's 1961 Congressional apportionment act could withstand an Art. I, § 2 challenge was presented in the most recent case of Wells v. Rockefeller, supra. Defendants argued in that case that the Supreme Court had "approved" the population variances by its affirmance of the New York three-judge court in Wright v. Rockefeller, and the similar Fourteenth Amendment case of Honeywood v. Rockefeller, 376 U.S. 222, 84 S.Ct. 708, 11 L.Ed.2d 656. The recent opinion of the New York three-judge court in Wells v. Rockefeller, supra, 273 F.Supp. at page 986, disposed of defendants' argument by holding that: "It is thus clear beyond a doubt that neither Wright nor Honeywood dealt with population disparities. Nor can they be made a sound basis for an argument that the constitutionality of the present Congressional districting statute has been sustained by these decisions."

such a question. It is therefore clear that the Supreme Court's affirmance of the Mississippi three-judge court cannot be said to constitute in any respect an approval of the variances contained in the Mississippi congressional districting plan. We so hold.

The only collateral relevancy the Mississippi litigation has to this case is the fact demonstrated by that litigation that a State legislature can act with much greater promptitude in apportionment matters than it has ever acted in the past once it makes up its mind that prompt action is necessary.

Our review of that litigation shows that it was on October 19, 1965 that the Mississippi Freedom Democratic Party filed in federal court its first challenge to the obviously malapportioned Mississippi congressional districting. That initial challenge was an Art. I, § 2 challenge. The 1966 Mississippi Legislature, faced with the almost certain prospect of an election at large, in spite of apportionment difficulties in its 1932 session described as a "long and acrimonious battle"), in 1952 session (described as reflecting "reluctance and inability to agree"), and in its 1962 session (described as having "kept the Legislature in an uproar for a major portion of its term"), was in fact able to pass a new congressional act in truly record speed. Indeed the Mississippi legislature passed a new redistricting act before a three-judge federal court could be assembled to hear the Art. I, § 2 challenge.

It was in the face of that unusually prompt legislative action that plaintiffs amended their complaint in order to challenge the constitutionality of the newly enacted 1966 Mississippi Act as a violation of rights guaranteed by the Fourteenth and Fifteenth Amendments. It was under those circumstances that the Art. I, § 2 population inequality challenge was, in effect, eliminated from consideration in the Mississippi three-judge court case.

It is significant that the same three-judge Mississippi court that decided the Mississippi congressional case has sub-sequently made clear that it fully understands that the Supreme Court announced additional controlling principles applicable to all future apportionment litigation when it decided Swann v. Adams III and Kilgarlin v. Hill. See Connor v. Johnson, S.D.Miss.1967, 265 F.Supp. 492.

The impact of those Supreme Court cases on future apportionment litigation in Mississippi is made clear by the Mississippi three-judge court when it held last March 3, 1967 that:

An examination of the decision [Swann v. Adams III] made it crystal clear that Senate Bill No. 1504 was fatally defective unless the variations above described could be explained on the basis of rational state policy, such as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts, or the recognition of natural or historical boundary lines. (265 F.Supp. at 493–494).

The consequence of a State legislature's refusal to make and keep accurate records of its legislative deliberations was made apparent by the Mississippi court in its most recent apportionment case. The court stated that it had entered a formal order giving the State an opportunity to offer [the] explanations now required by Swann v. Adams. Consistent with what every court has considered the impact of Swann v. Adams III to be, the Mississippi three-judge court held that it had no alternative except to "find Senate Bill No. 1504 to be unconstitutional on its face, null and void" because "the Mississippi Legislature keeps no stenographic report of its debates and requires no formal committee reports other than recommendations as to passage or rejection, it was impossible for the Attorney General to file [any] explanation" (265 F.Supp. 492 at 494).

Future Missouri Legislatures and the Attorney General of Missouri would be well advised to heed the teaching of this latest declaration of the Mississippi three-judge court should some new act of a future Missouri General Assembly be made the basis of some new motion to

seek approval of some new apportionment plan.[16]

## APPENDIX D

Discussion of Constitutional Significance of Inclusion of Constitutionally Required Decennial Census in Art. I, § 2 As It Relates to Use of Data Other Than Federal Census in Drawing Congressional Districts

The purpose of this Appendix is to place in historical perspective the constitutional significance of the inclusion of the decennial census in Art. I, § 2 of the Constitution as an integral part of the Great Compromise. A review of the proceedings of the Constitutional Convention of 1787 and of the Federalist papers reveals that one of the principle factors that enabled the Founding Fathers to reach agreement was the proposal and the acceptance of the idea that there would be included in the Constitution itself, as to be sharply distinguished from leaving the matter to the discretion of the Congress, a device under which the fundamental principle of representation based on population would be guaranteed by a constitutional requirement that the numbers of representatives would be periodically adjusted to meet the clearly anticipated changes in population that were bound to occur in the future.

Acceptance of the idea of a constitutionally required census clearly carried with it the rejection of qualifications of wealth or any other factor except population as established by Art. I, § 2 in its original form.

Study of the debates and the other historical data suggests that except for the establishment of the constitutional protection of the census which contemplated that the constitutional principle of equal representation according to numbers would be maintained by periodic reapportionments, it is quite unlikely that the Great Compromise would have been adopted. The future of equal representation was not left to take care of itself; it was clearly intended by the Founders that the Constitution itself would require that the principle of equal representation would be applied to all future changes in population as they would be periodically ascertained by the constitutionally required decennial census.

In Wesberry v. Sanders, supra, 376 U.S. at 8, 84 S.Ct. 526, at 530, 11 L.Ed. 2d 481, Mr. Justice Black took as his point of beginning the proposition that "The history of the Constitution, particularly that part of it relating to the adop-

16. Consistent with our now well established practice of discussing every case upon which the defendants rely in these congressional apportionment cases, a further word should be added in regard to Meeks v. Avery, supra. As a part of their attempted justification-by-comparison-with-other-states argument, defendants assert that the Kansas three-judge court approved a plan in which "the population of the largest district is 459,063 and the population of the smallest district 394,056" and that "this act was found to be in compliance with the population requirements of the United States Constitution in Meeks v. Avery." "Thus." defendants attempt to argue, "the United States District Court in Kansas * * * has approved congressional districts in the State of Kansas which have population variations well in excess of the districts in the 1967 Missouri Congressional Redistricting Act."

Keeping always in mind the principle stated in Swann v. Adams III that a variation from the norm "approved in one State has little bearing on the validity of a similar variation in another State" (385 U.S. at 445, 87 S.Ct. at 572), it is appropriate only to add that defendants apparently did not even read the Kansas case before they cited it. That court held that Kansas State census figures could be used; that the accuracy of those figures was not questioned by anyone; that the apparent 1960 federal census variation of 41,666 was not real; that the 8,490 variance under the State census was the actual variance; and that such variance was justified under the rationale of Martin v. Bush II, a case that we expressly refused to follow in Preisler II. We hold that the Kansas case has no more bearing on our decision in Preisler III than it had on our decision in Preisler II, for all the reasons we have generally stated in regard to defendants' comparative table argument. See also Appendix D.

tion of Art. I, § 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives."

And on page 13 it was most significantly added that:

The Constitution embodied Edmund Randolph's proposal for a periodic census to ensure 'fair representation of the people,' an idea endorsed by Mason as assuring that 'numbers of inhabitants' should always be the measure of representation in the House of Representatives. [376 U.S. at 13–14, 84 S.Ct. at 533].

This appendix will detail the constitutional history compressed in that short summary as it relates to the decennial census. Most of the debate in the 1787 Convention on Art. I, § 2 was concentrated in the month of July, 1787. Our page citations are to Volume III of Elliot's Debates (Jonathan Elliot ed. 1937).

The basic question of whether the Constitution or the Congress was going to control the apportionment of representatives was brought for the first time to the Convention on July 9, 1787 when Gouverneur Morris presented a committee report which fixed the House at 56 members and stated that "as the present situation of the states may probably alter, as well in point of wealth as in the number of their inhabitants, that the *legislature* be authorized from time to time to augment the number of representatives" (288, emphasis ours). Mr. Gorham, with candor typical of the Convention, stated that unless the Congress had power to regulate its own apportionment "the Western States, who may have a different interest, might * * * by degrees outvote the Atlantic" (288). He advocated that power to apportion be left with the Congress so that "the Atlantic States, having the government in their own hands, may take care of their own interest, by dealing out the right of representation in safe proportions to the Western States" (288).

Mr. Randolph expressed his dislike of the report. "He was apprehensive that, as the number was not to be changed till the national legislature should please, a pretext would never be wanting to postpone alterations, and keep the power in the hands of those possessed of it" (289).

Randolph introduced the idea of a census on July 10, 1787. The debates report that:

Mr. RANDOLPH [stated that] "it was in his contemplation, first, to make it the duty, instead of leaving it to the discretion, of the legislature, to regulate the representation by a periodical census; * * * " (291).

Randolph's idea of a constitutionally required census did not meet with immediate acceptance. Arguments and disagreement centered on the total size of the contemplated House; some wanted 65 members; a motion to double the number failed; and still another member wanted to cut 65 to 55. After a considerable amount of unproductive discussion, the debates, on page 293, show that:

Mr. RANDOLPH moved, as an amendment to the report of the committee of five "that, in order to ascertain the alterations in the population and wealth of the several states, the legislature should be required to cause a census and estimate to be taken within one year after its first meeting; and every _____ years thereafter; and that the legislature arrange the representation accordingly."

Gouverneur Morris, having the last say for that day, complained that the Randolph proposal would be "fettering the legislature too much." (293). He pointed to what to him was "the danger of throwing such a preponderance into the western scale * * * that, in time, the western people would out number the Atlantic States." Gouverneur Morris freely conceded that it was entirely possible that "if the legislature are left at liberty, they will never adjust the representation" (294).

On Wednesday, July 11, 1787, debate was resumed on Mr. Randolph's motion

"requiring the legislature to take a periodic census, for the purpose of redressing the inequalities in the representation." Randolph's census proposal focused attention on the problem of how and when the people were to be fairly counted so that they could in fact be equally represented. The delegates began to realize that all their talk about how many votes the original states were to have and all their expressions of fear of what sort of representatives unknown and untested portions of present and future populations might elect had obscured the necessity of finding and establishing a basic and fundamental principle that would guarantee, as best one generation can ever guarantee for the next, that their experiment with representative government be given a fair chance to endure. The debates show that immediately after Gouverneur Morris, joined by Sherman, had protested about "shackling the legislature," the following occurred:

Mr. MASON. The greater the difficulty we find in fixing a proper rule of representation, the more unwilling ought we to be to throw the task from ourselves on the general legislature. He did not object to the conjectural ratio which was to prevail in the outset; *but considered a revision from time to time, according to some permanent and precise standard,* as essential to the fair representation required in the first branch. According to the present population of America, the northern part of it had a right to preponderate, and he could not deny it. But he wished it not to preponderate hereafter, when the reason no longer continued. From the nature of man, we may be sure that those who have power in their hands will not give it up, while they can retain it. On the contrary, we know that they will always, when they can, rather increase it. * * * *Unless some principle, therefore, which will do justice to them hereafter, shall be inserted in the Constitution, disagreeable as the declaration was to him, he must declare he could neither vote for the system here,*

*nor support it in his state.* (294) (emphasis ours).

Mason answered the Gouverneur Morris' "danger to the Atlantic interests from new Western States" argument with a question: "Ought we to sacrifice what we know to be right in itself, lest it should prove favorable to states which are not yet in existence?" (295).

The debates show that Williamson joined Mason by stating that he was "for making it a duty of the legislature to do what was right and not leaving it at liberty to do or not to do it" (295). Randolph's response to Williamson's statement sounds almost like a quotation from a current Supreme Court apportionment case:

If equality between great and small states be inadmissible, because in that case unequal numbers of constituents would be represented by equal numbers of votes, was it not equally inadmissible, that a larger and more populous district of America should hereafter have less representation than a smaller and less populous district? If a fair representation of the people be not secured, the injustice of the government will shake it to its foundations. What relates to suffrage is justly stated, by the celebrated Montesquieu, as a fundamental article in republican governments (295).

Randolph pointed out the reason why the census must be a national and not a state census. He said:

The census must be taken under the direction of the general legislature. The states will be too much interested to take an impartial one for themselves (295).

Gouverneur Morris, apparently sensing a change of mood in the convention again protested that placing the idea of a census and reapportionment in the Constitution "fettered the legislature too much" (296). Sherman, who had theretofore supported Gouverneur Morris, changed his view of the matter. The Debates show that Sherman explained that while "he was at first for leaving the matter

wholly to the discretion of the legislature; * * * he had been convinced by the observations of (Mr. Randolph and Mr. Mason), that the *periods* and the *rule* of revising the representation ought to be fixed by the constitution" (297). (both parenthesis and emphasis from the Debates).

The convention's shift from Gouverneur Morris' view after Sherman left him was rapid. The supporters of "unshackled" and "unfettered" legislators never survived the following question:

Mr. GORHAM. If the Convention, who are comparatively so little biased by local views, are so much perplexed, how can it be expected that the legislature hereafter, under the full bias of those views, will be able to settle a standard? (297).

Gorham added that he "was convinced, by the arguments of others and his own reflections, that the Convention ought to fix some standard or other" (297).

Gouverneur Morris fought to the end against any constitutional standard. He continued to reflect his fear of the men who would come from what he described as "the remote wilderness." "If the western people get the power into their hands," he cried, "they will ruin the Atlantic interests." He professed to be outraged at the apparent distrust being evidenced against the "fidelity" of legislators. He argued that if the legislators' "duty, their honor, and their oaths, will not bind them, let us not put into their hands our liberty, and all our other great interests; let us have no government at all." (298).

The debates show that James Madison immediately took the floor. The debates report that:

Mr. MADISON was not a little surprised to hear this implicit confidence urged by a member who, on all occasions, had inculcated so strongly the political depravity of men, and the necessity of checking one vice and interest by opposing to them another vice and interest. (298).

Madison added that:

The truth was, that all men having power ought to be distrusted to a certain degree * * *. With regard to the Western States, he was clear and firm in opinion that no unfavorable distinctions were admissible, either in point of justice or policy (298–9).

Pinckney said, when the debate continued the next day, that he "foresaw that, if the revision of the census was left to the discretion of the legislature, it would never be carried into execution" and that he believed "the rule must be fixed, and the execution of it enforced by the Constitution" (302).

The debates show that on July 13, 1787:

On the motion of Mr. RANDOLPH, the vote of Monday last, authorizing the legislature to adjust, from time to time, the representation upon the principles of *wealth* and numbers of inhabitants, was reconsidered by common consent, in order to strike out *wealth*, and adjust the resolution to that requiring periodical revisions according to the number of whites and three-fifths of the blacks (307–8) (Italics in the Debates.)

Randolph's motion passed with no opposing votes; Delaware, however, was recorded as divided. That action clearly reflects the view of the Convention that, to use Madison's words, "all men having power ought to be distrusted to a certain degree," and its determination that the duty to reapportion periodically in accordance with a constitutionally required census was a situation to which that principle was applicable.

The Federalist Papers show that when it came time to convince the people that the Constitution should be adopted, the idea that the census would insure that representation based on equal population would be periodically adjusted was emphasized as a fundamental reason why the Constitution should be adopted.

The original number of 65 for the original Congress was defended in Federal-

ist No. 55 on the ground that the constitutionally required census would remedy any future malapportionment by the anticipated periodic reapportionments required by Art. I, § 2. No. 55 stated:

> Within three years a census is to be taken, when the number may be augmented to one for every thirty thousand inhabitants; and within every successive period of ten years the census is to be renewed, and augmentations may continue to be made under the above limitation. * * * the number of representatives will be augmented from time to time in the manner provided by the Constitution. On a contrary supposition, I should admit the objection to have very great weight indeed. (Putnams Sons, 1888 edition, p. 347).

Federalist No. 58 answered a charge that "the numbers of members [of the House of Representatives] will not be augmented from time to time, as the progress of population may demand." Madison conceded that if "well supported * * * this objection * * * would have great weight" (362). But, Madison stated:

> Those who urge the objection seem not to have recollected that the federal Constitution will not suffer * * * in the security provided for a gradual augmentation of the number of representatives. The number which is to prevail in the first instance is declared to be temporary. Its duration is limited to the short term of three years. *Within every successive term of ten years a census of inhabitants is to be repeated. The unequivocal objects of these regulations are, first, to readjust, from time to time, the apportionment of representatives to the number of inhabitants, under the single exception that each State shall have one representative at least;* secondly, to augment the number of representatives at the same periods, under the sole limitation that the whole number shall not exceed one for every thirty thousand inhabitants. (362) (emphasis ours).

Federalist No. 60 made perfectly clear than "an uncontrollable power over elections to the federal government could not, without hazard, be committed to the State legislatures" (373). With great insight and accurate foresight, No. 60 predicted that a particular states' representation in the national Congress would "generally be a faithful copy of the majorities [that prevail in the State legislatures]" (377). History has taught the people of the United States the hard lesson that a malapportioned State legislature will almost inevitably produce a malapportioned Congressional delegation.

The constitutional history of Art. I, § 2 would seem to make it apparent that the Founders included the decennial census in that section as a central instrument specifically designed to control and adjust the constitutionally required future apportionments of the House of Representatives. It would seem historically incongruous not to require the use of the constitutional decennial census in the establishment of congressional districts within the States. A rejection of the federal decennial census as the exclusive guideline for congressional districting would have grave and particular significance in future congressional reapportionment cases. We therefore deem it appropriate to articulate some of the considerations that we believe must necessarily be taken into account in cases in which the problem will be in more precise focus than it is under the questions presented in this case.

It is our view that the constitutional requirement that a decennial census must be taken embodies a concept that is an integral part of the Great Compromise itself; it was designed to rectify and to protect against the foreseen probability of the injustice of future unremedied malapportionments. The Constitution therefore required that the census be a *federal* census and that it be a regular decennial census. The Founders explicitly recognized that the States were not to be relied upon in a matter in which their respective interests were so ob-

viously apparent. The ten year period was designed to fix a period of relative stability during which all States were to be required to wait before asserting any claim for additional representation. And their claims were to be based on accurate population data collected by the federal government.

The idea of apportionment of representatives among the States based on the federal census and the notion that the districting within the States for election of federal representatives may be based on some sort of state census would seem to be basically inconsistent with the primary reason for the Founder's insistence that the constitutionally required decennial census be a *federal* census. The self-interest of at least sectors of particular States to manipulate their own local census figures would obviously have a drastic impact on the composition of the House of Representatives.

We are, of course, familiar with the fact that Meeks v. Avery, supra, without the benefit of Supreme Court guidance, found that the Kansas legislature committed "no constitutional fault" when it used state census figures rather than federal. The recently reversed case of Lucas v. Rhodes, supra, indicated its agreement with that notion. Both cases cited Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), the Hawaii state opportionment case. We believe that the Supreme Court's very careful statement in that case that use of voter registration figures satisfies "the Equal Protection Clause only because on this record it was found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis," was significantly limited to . state apportionments and should not be indiscriminately read as the establishment of a principle applicable to congressional apportionment cases. We do not reach the precise question in *Preisler III* of whether any figures other than the federal decennial census may be used in support of a congressional districting plan, but we deem it appropri-

ate to indicate our disagreement with the rationale of Meeks v. Avery and Lucas v. Rhodes.

Some have urged that legislatures and courts in the 1960's should wait until after the 1970 census before attempting compliance with the command of Art. I, § 2 as construed in Wesberry v. Sanders. The argument runs that the 1960 census figures are so hopelessly out of date today that discrimination would result if those figures are used in a current redistricting plan. It seems to us that this is an argument that must be said to be foreclosed by the Constitution itself.

The idea that a mid-census apportionment plan may be discriminatory because of growth since the last decennial enumeration disregards the fact that the Constitution anticipated that only one redistricting would follow each decennial census. The ten year period of political stability anticipated by the Founders would be destroyed if population data other than the decennial census should be looked to as the standard for ascertainment of population. For if the decennial census can be disregarded for the purpose of justifying variances that depart from the "as nearly equal as is practicable" standard of Art. I, § 2, the population data other than the decennial census would logically be available for an attack on a plan initially valid but which, because of population shifts, developed substantial variances before the next decennial census was taken.

■■■ Those who wish to wait until after the 1970 census are, in effect, questioning the constitutional relevancy of the 1960 decennial census. But suppose that in 1971 the General Assembly of Missouri passes a congressional redistricting bill that is then in fact and law "as nearly equal as practicable"; and further suppose that current population trends of growth in urban areas continue through the 1970's. Is the constitutional relevancy of the 1970 census to be subjected to challenge before every congressional election during that decade? Must the legislature redistrict in 1973, 1975, 1977 and 1979 in order to account

for current population trends? We think not. We think that the decennial census as a constitutional tool implicitly requires that the population changes inherent in its ten year mandatory period must be tolerated until the next decennial census in order to maintain the period of relative political stability contemplated by the Constitution.

We feel that the constitutional significance of the census should and must be maintained in congressional redistricting cases. The Supreme Court as yet has not directly considered the problem; and we need not, and therefore do not, reach the precise question discussed.

COLLINSON, District Judge:

I deem it appropriate to add a word to my joinder in the majority opinion in light of the construction that my Brother Matthes suggests might be placed on the opinion of the Court.

No one can believe or contend that the Supreme Court has said that the "one-man one-vote" doctrine requires that Congressional districts be exactly equal in population; certainly the majority opinion does not so state. But neither has the Supreme Court said that there is a mathematical formula for inequality (within a certain percentage) which will satisfy the "nearly equal as practicable" rule.

It seems obvious that existing voting units, within which the votes are cast, counted, and tallied, are the building blocks from which congressional districts are constructed. It seems equally obvious that since these units vary considerably in population, exact mathematical equality cannot be attained without changing the size of the building blocks. None of the cases requires this. All that the cases require is that the State legislature adopt "a rational policy" as to the units to be used, and then the variations which will result from the use of existing political boundaries are justifiable.

The apparent, although undeclared, policy as to the existing political boundaries in the 1967 Act now before the Court was to use precincts (in the city and metropolitan counties) as the proper units for those metropolitan areas, and to use the county as the unit in the remainder of the State.

If the population variations which exist in the 1967 Act resulted from the preservation of existing political boundaries under that plan, I would have no quarrel with it.

But the variations in this Act do not result from any attempted preservation of boundaries. The largest variations result from failure to remove entire counties from their old district and place them in an adjoining district. For example, if Dent County were taken from the 8th District (+13,542) and placed in the 10th (−8,113), the 8th would then be only +3,097 and the 10th would be +2,332. A similar shift could be made of Hickory County from the 7th District to the 4th District. The three St. Louis districts are over 16,000 long, but the adjacent 9th is 3,750 short and the 6th next to it is 9,750 short.

I do not condemn the 1967 Act because there were more equal plans defeated in the Legislature; nor do I condemn it because it divides St. Louis County between a number of districts. I believe the plan is unconstitutional because on its face and under the undisputed evidence it is not an attempt to divide the State of Missouri in Congressional districts that are as nearly equal in population as is practicable. And this for the reason that it is obvious that entire counties can be moved to adjoining districts with a resulting substantial decrease in the variances of population in the present Act and because there is no evidence in this record that can be said to explain or justify why this was not done.

In short, the proponents of the 1967 Act have failed to carry the burden of proof imposed on them by law.

MATTHES, Circuit Judge (dissenting).

I respectfully dissent.

In my view the majority effectively but unwarrantedly sounds the death knell

to the "de minimis" doctrine in the field of Congressional redistricting. If the majority opinion survives and becomes the law, no Congressional redistricting act enacted by the Missouri Legislature can withstand judicial scrutiny so long as that body could conceivably formulate a better plan which would mathematically redistrict the state with greater equality. In short, the majority rejects the Missouri plan despite the relatively minor variations in populations between districts because it does not approach their standards of perfection. Their position necessarily leads to the conclusion that only the courts can ultimately assume and properly complete the task of Congressional redistricting—a function primarily committed to the state legislatures. Even the courts, however, would be beset with difficulties in formulating court plans to comply with the unduly strict and unrealistic standards enunciated by the majority.

The "as nearly as is practicable" standard of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), or "the substantial equality of population" rule enunciated in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), do not require the mathematical exactness contemplated by the majority. The Supreme Court has fully realized the impossibility of drawing Congressional districts with "mathematical precision." Wesberry v. Sanders, supra, 376 U.S. at 18, 84 S.Ct. 526. Attainment of the "as nearly as is practicable" standard has been relegated to the legislature, not to the judgment of an idealist divorced from the problems and pressures which beset the legislator. More recently in Reynolds v. Sims, supra, a state reapportionment case involving a far greater population disparity between districts than is present here, the Supreme Court reiterated its view that "mathe-

matical nicety is not a constitutional requisite":

"We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." 377 U.S. at 577, 84 S.Ct. at 1390.

Cf. Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964).

In reaching the conclusion that the 1967 Act does not pass constitutional muster the majority proceeds to discard the "de minimis" principle on the rationale that if the legislature can at any point reapportion the state on a more equal basis, without doing violence to any articulated legally acceptable state policy, that doctrine has no applicability.

Although neither Wesberry nor Reynolds expressly incorporates the "de minimis" doctrine by name, its applicability in appropriate situations is implicit in both decisions. Reynolds plainly holds that "minor variations" based on legitimate considerations are permissible. 377 U.S. at 579, 84 S.Ct. 1362.

In Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), on the other hand, Mr. Justice White stated for the majority:

"De minimis deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases suggests that differences of this magnitude will be approved without satisfactory explanation grounded on acceptable state policy." 385 U.S. at 444, 87 S.Ct. at 572.

To me the quoted statement lends itself to the interpretation that if the variations are of a "de minimis" nature the plan should be judicially approved.[1] No

---

1. Consideration of various judicially drafted Congressional redistricting plans, which the Courts have formulated as the result of legislative inaction, reveals the difficulties inherent in attempting to achieve substantial equality in population in creating Congressional districts. In my view each of these court-created plans embodies the philosophy that the "de minimis" doctrine is applicable in reapportionment cases. In each instance a Three-Judge court adopted and approved a plan which included variations from the norm, without attempting to achieve a

less an authority than Judge Oliver has recognized the applicability of the doctrine in *Preisler II*. Speaking for the Court Judge Oliver stated:

> "Use of such words as 'feasible' and 'practicable' in a careful statement of the fundamental constitutional principle constitutes but a recognition that the familiar doctrine of de minimis is applicable and is designed to make clear that a State legislature would not be expected to create entirely new political subdivision lines in order to have absolute and precise mathematical equality in its congressional districts." 257 F.Supp. at 973.

Although the majority seems to disavow any reliance on the "de minimis" doctrine on the basis that only two Supreme Court [Baker v. Carr, 369 U.S. 186, 258, 82 S.Ct. 691, 7 L.Ed.2d 663 (1960) and Swann v. Adams, supra] and three lower court decisions have made specific reference to the pharse "de minimis", I

believe its implicit recognition by the Supreme Court as well as other Three-Judge courts lies in their approval of redistricting acts which have contained a measurably greater degree of disparity between districts than does the Missouri Act. See Connor v. Johnson, infra.

The majority opinion in my view has been induced in large part by an erroneous concept of the extent to which the proponents of redistricting legislation must carry forward the burden of proof enunciated in Swann v. Adams, supra and Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). In Swann v. Adams the Supreme Court voided a state reapportionment plan consisting of variations of 30% and 40% among Senate and House districts "for the failure of the State to present or the District Court to articulate acceptable reasons for the variations among the populations of the various legislative districts with respect to both the senate and house of

greater degree of equality between districts.

In Baker v. Ellington, Civil No. 3945, M.D.Tenn., July 13, 1967, 273 F.Supp. 174, the Court redistricted the State of Tennessee, which had a population of 3,-567,089, into nine districts. Based on this figure the ideal population per district was 396,343. The Court-adopted plan provided for a difference in population of 16,728 between the largest and smallest Congressional district, or stated differently, a maximum variation of 2.-176% above the ideal district and 2.044% below.

In Maryland Citizens Committee For Fair Cong. Redist. v. Tawes, 253 F.Supp. 731, 733 (D.Md.1966), aff'd sub nom., Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966), a Three-Judge district court, after holding unconstitutional the 1965 Maryland Congressional Redistricting Act, prescribed its own redistricting plan with a maximum deviation ratio of 1.026 to 1, or a difference of 9,973 between the population of the largest and smallest district.

Under another court-created redistricting plan, the State of Florida was divided into twelve Congressional districts, each consisting ideally of 412,630 persons. The largest district contained a population of 415,704 or .74% greater than the ideal district, while the smallest district contained a population of 407,677, a difference of 8,027, or 1.20% below the ideal. Gong v. Kirk, Civil No. 64–143, S.D.Fla., August 2, 1967, 278 F. Supp. 133.

A Three-Judge district court in Montana eliminated a previous disparity of 126,332 between that state's two Congressional districts by creating two new districts having a population of 327,019 and 347,701, respectively. or a variation of 20,682. Roberts v. Babcock, 246 F. Supp. 396 (D.Mont.1965).

In Illinois a Three-Judge federal court in consultation with the state court divided the state into twenty-four Congressional districts. The plan was adopted despite the fact that the district having the least population (No. 16–394.481) deviated from the norm 420,048) by 6.1%, and the largest district (No. 8–451,527) by 7.5%. People ex rel Scott v. Kerner, 33 Ill.2d 460, 211 N.E.2d 736 (1965).

Lastly, in Klahr v. Goddard, 250 F. Supp. 537 (D.Ariz.1966), a Three-Judge court apportioned Arizona's three Congressional districts on the basis of the 1960 census. The court's plan reshuffled various counties from one district to another to equalize the population disparity, but resulted nonetheless in a 61,-244 variance in population between the First and Third districts.

representatives." Id. 385 U.S. at 443–444, 87 S.Ct. at 572. In Kilgarlin v. Hill, the Supreme Court rejected an equally malapportioned plan for the reason that:

> "Under that case [Swann v. Adams] it is quite clear that unless satisfactorily justified by the court or by the evidence of record, *population variances of the size and significance evident here* are sufficient to invalidate an apportionment plan. Without such justification, appellants' analysis of H. B. 195 made out a sufficient case under the Fourteenth Amendment." Id. 386 U.S. at 122, 87 S.Ct. at 822. (Emphasis supplied.)

My brethren have interpreted these foregoing pronouncements of the Supreme Court in a very narrow light. Their position appears to be that a redistricting scheme containing minor variations in population between districts cannot satisfy the one man, one vote concept, absent the presentation of acceptable proof for these variations. This theme is clearly manifested in their statement that " * * * the Constitution does not leave room for intentional 85%, 95%, or even 98% compliance with its mandate; Art. I, § 2, commands equality of population in Congressional districts 'as nearly as practicable' and that any enacted plan that fails to comply with that constitutional standard, unless otherwise justified by substantial evidence in accordance with applicable law, is constitutionally void." I would agree that population variances between districts of the magnitude of those present in Wesberry v. Sanders, supra, and Swann v. Adams, supra cannot stand absent a justifiable explanation of the reasons for such variations. I cannot, however, subscribe to the view that every unexplained, unjustified minor deviation from the ideal district renders the entire redistricting scheme constitutionally void. It seems utterly unrealistic to advocate that even a small variation of only 2% between the largest and smallest districts, absent justification, cannot survive constitutional attack. That, however, is precisely what the majority claims to be the law.

To consistently apply the majority rationale to Congressional redistricting schemes would require a legislature to consider population alone as the sole, determinative standard for Congressional redistricting. Under such an approach a greater exactness in equality of population would necessarily and properly be required. The Supreme Court, however, has not renounced all considerations other than population equality in Congressional redistricting. I do not intimate that the "equal population principle" has been discarded or weakened. It is *the* essential element, but the Supreme Court has also averted to other factors as justifiable variations from a pure population standard, such as the "integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts and the recognition of natural or historical boundary lines." Swann v. Adams, supra, 385 U.S. at 444, 87 S.Ct. 569 at 572. Reynolds v. Sims, supra, 377 U.S. at 578–579, 84 S.Ct. 1362; Cf. Wells v. Rockefeller, 273 F.Supp. 984 (S.D. N.Y.1967), aff'd, 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (December 19, 1967); Drum v. Seawell, 250 F.Supp. 922, 924–925 (M.D.N.C.1966).

Although various leaders of the Missouri Senate and House of Representatives testified unequivocally that population was the primary factor utilized in securing adoption of the Act, they did attest to the fact that the legislature did take into account other permissive considerations, such as those policy considerations specified in *Reynolds* and *Swann,* in drafting the 1967 Act. This is not to suggest that the Missouri Legislature has justifiably articulated its reasons for the variances that do exist, but merely points out, I believe, some of the intangible considerations and pressures which confronted the Missouri General Assembly as well as other state legislatures, and discloses the futility of a leg-

islative attempt to formulate districts of precise equality in populations.[2]

An analytical comparison of the various legislative redistricting plans that have been subjected to judicial scrutiny will aptly disclose that the variations in population under the 1967 Act are truly of a "de minimis" nature. In no case has either the Supreme Court or any other Three-Judge court held constitutionally void variations as minimal as those present in the Missouri Act. See Appendix I, infra. The following Table, based upon the population of Missouri as disclosed by the 1960 census, accurately portrays the result achieved by the Missouri Legislature in the 1967 Act.

| District No. | Population | Per Centage of Variation From Ideal |
|---|---|---|
| One | 439,746 | + 1.8 |
| Two | 436,448 | + 1.03 |
| Three | 436,099 | + .95 |
| Four | 419,721 | − 2.84 |
| Five | 431,178 | − .19 |
| Six | 422,238 | − 2.26 |
| Seven | 436,769 | + 1.11 |
| Eight | 445,523 | + 3.13 |
| Nine | 428,223 | − .87 |
| Ten | 423,868 | − 1.88 |

| | |
|---|---|
| Ideal population per district: | 431,981 |
| Average variation from Ideal: | 1.6% |
| Ratio of largest to smallest district: | 1.06 to 1 |
| Number of districts above Ideal: | 5 |
| Number of districts below Ideal: | 5 |
| Number of districts within 1.88% of Ideal: | 7 |
| Population difference between largest and smallest districts: | 25,802 |

———◆———

By way of comparison, the 1961 Act voided in *Preisler I* created districts with an average variation of 8.47% from the ideal. In striking contrast to the 1967 Act the difference in population between the largest and smallest district was 128,-355 or a disparity ratio of 1.339 to 1. The 1965 Act declared unconstitutional in *Preisler II* produced Congressional districts with an average variation of 6.54% from the ideal district. The disparity ratio of the largest to smallest district was 1.218 to 1 or a population spread of 85,015.

What is the practical effect of these maximum variations? Simply stated, a

2. On page 5 the opinion states, in substance, that after defendants learned that the actual population variances were in many instances substantially greater than those appearing in defendants' motion, they advised the court of their desire to "adduce evidence to attempt to justify the greater variations that had in fact been established." This does not comport with my knowledge and understanding of the pre-hearing proceedings. The Attorney General of Missouri advised Judge Oliver by letters dated October 11th and October 17, 1967 (copies to Judge Collinson and me) that he desired to produce witnesses at the hearing. The Attorney General did not state in either letter, or in any other communication within my knowledge that he would attempt to justify the greater variations. In view of my basic position, this matter is of no great significance. In fairness, however, to the Attorney General, my comprehension of what transpired should be recorded.

Congressman from the Eighth District (the largest) would represent 25,802 more constituents than his counterpart from the Fourth District (the smallest). Considering the fact that each Congressman would represent 431,981 persons if the state could be divided on an exactly equal population basis, I have difficulty in comprehending how the residents of the Eighth District would, for practical purposes, be appreciably deprived of substantially equal representation in Congress. Certainly the 6% variation in the Missouri plan is a far cry from the 430,-368 population spread between districts found in *Wesberry,* or the approximately 30% to 40% population variations in *Swann, Kilgarlin,* Lucas v. Rhodes, Civil No. 65–264, N.D.Ohio, 1967, rev'd per curiam, 389 U.S. 212, 88 S.Ct. 416, 19 L. Ed.2d 423 (1967); and the large variations in Wells v. Rockefeller, supra.

*The Mississippi Case.* Despite the herculean efforts of my brothers to sweep Connor v. Johnson, 386 U.S. 483, 87 S. Ct. 1174 (1967), under the rug as wholly irrelevant to the case before us, (see Appendix C of the majority opinion) I strongly believe that *Connor* supports my conclusion that the Missouri Act is constitutional, and that the variations therein can only be considered "de minimis" in nature. I do not propose to engage in a lengthy battle of words over the underlying reason for the Supreme

Court's summary affirmance of the district court's decision validating the 1966 Mississippi Redistricting Act. The fact is, as revealed by the district court's opinion, Connor v. Johnson, Civil No. 3830, S.D.Miss., September 28, 1966, 256 F.Supp. 962, the variance in population among the Congressional districts was an issue before that court. The jurisdictional statement, considered in context, discloses that this same issue was before the Supreme Court.[3] Even though the appellants in *Connor* did not squarely present the case before the Supreme Court in terms of an Article I, § 2 issue, I submit that the Supreme Court was concerned with the substance of all facets of the Mississippi Act, and would have unhesitatingly reversed if the variations in populations violated its one man, one vote concept as enunciated in prior cases.

Inasmuch as the difference in population between the largest and smallest districts in Mississippi is 26,265, as compared to 25,802 under the Missouri Act, or a disparity ratio of 1.062 to 1, I am driven to the conclusion that *Connor* is impelling authority for approval of the Act before us.[4]

In view of the strictness of their holding the majority has unwarrantedly given great emphasis to the failure of the General Assembly to use population figures that accurately reflected the 1960

3. "Nor does the legislature's adopted plan conform to standards of population equality when compared to the available alternatives. The difference between the largest and the smallest district under the plan adopted is 28,-061; the same figure for the Revised Delta Plan is 13,672, less than half. The greatest deviation from the norm in the adopted plan is 15,332; in the Revised Delta Plan, it is 7,572. The average deviation of all five districts in the adopted plan is 11,547; in the Revised Delta Plan it is 3,767. Clearly, the desire to achieve mathematical population equality was not decisive for the Mississippi legislature in its choice of plans." P. 8, appellants' jurisdictional statement filed in the Supreme Court.

4. Toombs v. Fortson, 241 F.Supp. 65 (N.D. Georgia, 1965), affirmed without opinion, 384 U.S. 210, 86 S.Ct. 1464, 16 L.Ed. 2d 482 (1966), teaches that a departure figure of 15% is permissible. I am mindful that *Toombs* involved reapportionment of the Georgia General Assembly. This does not dilute the strength of the pronouncement of the *Toombs* court. The Supreme Court has held, by implication if not expressly, that the standards for testing the validity of a state apportionment plan are applicable in determining whether a Congressional redistricting scheme satisfies the mandate of the Constitution. Huddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 77 L.Ed.2d 508 (1967); Wells v. Rockefeller, supra, aff'd sub nom., Rockefeller v. Wells, 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (Dec. 19, 1967).

# 1010

census. I need not recount in detail the testimony of Senator Avery, who sponsored the 1967 Act in the General Assembly, in regard to the Legislature's misgided source of information. That testimony does reveal, however, that the sources of the inaccurate population data were in part the various Election Boards in the City of St. Louis, St. Louis County, and Jackson County, which encompasses the Kansas City area. I am completely satisfied from my reading of the record that the sponsors of the 1967 Act clearly labored under the misguided impression that the sources of the inaccurate figures were reliable. Despite the inaccuracies, however, both parties stipulated that this Court should determine the validity of the 1967 Act on the basis of the 1960 census population. The difference, moreover, between the correct and incorrect figures for the entire state amounted to a negligible 1,280.

This case should be decided on the basis of what was in fact achieved by the Missouri General Assembly in light of the correct population figures. To me, the crucial question is not whether a better plan might have been adopted if the correct figures were used, but rather whether the variations in population created by the 1967 Act, based on accurate population figures, offend the principle of substantially equal representation.

Under the rigid formula promulgated by the majority, I am satisfied that any reapportionment scheme which might have resulted on the basis of the correct population figures, would similarly have been destined to judicial condemnation.

The underlying rationale of the majority is very disturbing to me. Careful analysis of their opinion will permit only one conclusion—that if in the judgment of the court, not the legislature, a plan providing for greater equality in representation can be formulated, the legislative plan must fail. Appendices A and B attest to this conclusion. In those appendices the court has engaged in a game of "redistricting checkers" by shifting counties and townships from one district to another in order to demonstrate how smaller deviations could have been reached. This reasoning runs counter to my conception of the law.

Whether the 1967 Act is constitutionally permissible should not be tested by the results that could be achieved by the use of a "mindless computer" or by the efforts of a group that is completely detached from the duties, responsibilities and perplexing problems of duly elected legislators. Obviously the Seventy-Fourth General Assembly did not achieve mathematical perfection in the distribution of Missouri's overall population. The problem of population disparities, however, cannot be reconciled solely in terms of a mechanical test of shifting counties until the judicial ideal is met. *If every apportionment Act must be cast aside because a reviewing court could devise a scheme for more equal representation, I believe it is high time that the Supreme Court, in no uncertain language, promulgates such a standard.* See dissenting opinion of Mr. Justice Harlan in Rockefeller v. Wells, supra.

I would hold that the 1967 Act conforms to the mandate of the Constitution.

## APPENDIX I

A—Plans Held Unconstitutional. *Affirmed by Supreme Court
**Court Plan Subsequently Adopted

| STATE | CASE | Population Difference Between Largest and Smallest Districts | Ratio of Largest to Smallest District |
|---|---|---|---|
| ** ARIZONA | Klahr v. Goddard D.C., 250 F.Supp. 537 | 465,274 | . . . . . |
| ARKANSAS | Park v. Faubus D.C., 238 F.Supp. 62 | 242,541 | 1.73 to 1 |
| ** FLORIDA | Gong v. Kirk D.C., 278 F.Supp. 133 | 90,495 | . . . . . |
| ** MARYLAND* | Maryland Citizens Comm., etc. v. Tawes D.C., 253 F.Supp. 731 | 113,505 | 1.34 to 1 |
| MASSACHUSETTS | Dinis v. Volpe D.C., 264 F.Supp. 425 | 102,626 | 1.27 to 1 |
| MICHIGAN | Calkins v. Hare D.C., 228 F.Supp. 824 | 188,084 | 1.6 to 1 |
| * NEW YORK | Wells v. Rockefeller D.C., 273 F.Supp. 984 | 120,366 | . . . . . |
| NEBRASKA | Exon v. Tiemann D.C., 279 F.Supp. 603 (1967) | 126,403 | 1.312 to 1 |
| NEW JERSEY | Jones v. Falcey 48 N.J. 25, 222 A.2d 101 | 64,760 | . . . . . |
| ** TENNESSEE | Baker v. Clement D.C., 247 F.Supp. 886 | 111,830 | 1.32 to 1 |
| VIRGINIA | Wilkins v. Davis 205 Va. 803, 139 S.E.2d 849 | 214,208 | 1.68 to 1 |

B—Held Constitutional *Reversed by Supreme Court
 **Affirmed by Supreme Court

| STATE | CASE | Population Difference Between Largest and Smallest Districts | Ratio of Largest to Smallest District |
|---|---|---|---|
| ALABAMA | Moore v. Moore D.C., 246 F.Supp. 578 | 54,505 | 1.14 to 1 |
| ILLINOIS | Kirby v. Illinois State Electoral Board D.C., 251 F.Supp. 908 | 57,046 | . . . . . |
| * INDIANA | Grills v. Branigin D.C., 255 F.Supp. 155 | 84,545 | 1.2 to 1 |
| KANSAS | Meeks v. Avery D.C., 251 F.Supp. 245 | 15,060 | 1.03521 to 1 . . . . . |
| ** MISSISSIPPI | Connor v. Johnson D.C., 265 F.Supp. 492 | 26,265 | 1.062 to 1 |
| NEW HAMPSHIRE | Levitt v. Maynard 105 N.H. 447, 202 A.2d 478 | 56,715 | 1.2 to 1 |
| NORTH CAROLINA | Drum v. Seawell D.C., 271 F.Supp. 193 | 17,276 | 1.04 to 1 |
| * OHIO | Lucas v. Rhodes (Unreported) | 137,806 | 1.430 to 1 |
| TEXAS | Bush v. Martin D.C., 251 F.Supp. 484 [Held provisionally constitutional] | 80,892 | 1.22 to 1 |